# CHARLESTON.

## STATE v. FREDLOCK.

Submitted June 16, 1902. Decided December 13, 1902.

1. JURISDICTION.

   When the jurisdiction of a court is asserted over a cause of action, it embraces everything in the case and every question arising which can be determined in it; and, until thus exhausted, or in some way relinquished, the jurisdiction is exclusive and cannot be encroached upon by any other tribunal. (p. 238).

2. JURISDICTION.

A court having jurisdiction *in personam*, may require the defendant to do, or refrain from doing, beyond its territorial jurisdiction, anything which it has power to require him to do or omit within the limits of its territory.   (p. 238).

3. COURT'S POSSESSION OF PROPERTY.

When the object of a suit requires the control and dominion of the property involved in the litigation, the court which first acquires possession, or that dominion which is equivalent to possession, becomes vested with the exclusive right to dispose of it for the purpose of its jurisdiction.   (p. 239).

4. JURISDICTION—*In personam*—*Contempt*.

A court having jurisdiction *in personam* may restrain a party from prosecuting a subsequent suit in another county, the effect of which will be to withdraw, from the court first acquiring jurisdiction, a part of the subject matter of the suit, and disobedience of the injunction order is an act of contempt which may be summarily punished.   (p. 239).

5. INJUNCTION.

Sections 4, 6 and 9 of chapter 133 of the Code of 1899 are not applicable to an injunction awarded by a court in aid of its own jurisdiction based upon grounds wholly independent of the injunction.   (p. 239).

6. INJUNCTION—*Jurisdiction*.

An injunction, issuing from one court, to stay proceedings in another, operates upon the parties only, and does not affect the jurisdiction of such other court.   (p. 239).

Error to Circuit Court, Ohio County.

Action by the State against J. C. Fredlock and another. Judgment for plaintiff, and defendants bring error.

*Affirmed.*

F. M. REYNOLDS and TAYLOR MORRISON, for plaintiffs in error.

HUBBARD & HUBBARD, for the State.

POFFENBARGER, JUDGE:

On the 5th day of December, 1900, the circuit court of Ohio County entered an order, requiring J. C. Fredlock to appear in that court on the 12th day of December, 1900, to show cause, if any he could, why he should not be attached for his con-

tempt to said court, offered by his violation of an order of injunction, made and entered by that court in the chancery cause of the West Virginia Loan Company and others against Mary L. McMechen and others, restraining the said Fredlock and the Peidmont Feed and Ice Company from further proceeding in a suit in equity, instituted by them in the circuit court of Mineral County, on the 19th day of December, 1899. On the 6th day of December, 1900, another order was entered, filing certain affidavits and directing the attention of the court to a certain exhibit filed in said chancery suit and again ordering said Fredlock to appear on the 12th day of December, 1900. On said 12th day of December, another order was entered, reciting that the rule awarded on December 5th had not been served, and another rule was awarded requiring Fredlock to appear, on December 21st, to show cause, etc. This last order was served and Fredlock appeared on the 2nd day of March, 1902, and filed his answer in writing and moved that the rule be dismissed. The court overruled the motion, found Fredlock guilty and entered a judgment against him, imposing a fine of fifty dollars, and awarding an attachment to hold him until the fine and costs should be paid, and further ordering that he cease from all further proceedings in said chancery suit, and cause the proceedings therein to be stayed, and that he attached until he shall have complied with the order. To this he has obtained a writ of error and *supersedeas.*

To the end that the ground upon which it is claimed the judgment is erroneous may be clearly understood, it is necessary to set out the facts and proceedings leading up to it. The West Virginia Loan Company was a building association, organized in 1896. For two years or more, it carried on an extensive business, having numerous stockholders and borrowers in various parts of the State and outside of it. The plaintiff in error was a stockholder and borrower to the amount of several thousand dollars. On the 5th day of October, 1898, a meeting of the stockholders was held, and a resolution adopted, providing for the voluntary dissolution of the corporation, it having been ascertained that the business could not be profitably prosecuted any further. At March rules, 1899, of the circuit court of Ohio County, the West Virginia Loan Company, James B. McKee, president of said company, Julian G. Hearne, Al-

fred Paull, George Hook and J. T. Carter, members of the
board of directors, filed their bill in equity to wind up the busi-
ness and affairs of said corporation, making all its stockholders,
and others interested, parties thereto.    Process issued thereon
March 6, 1899, but was not executed as to all the parties. Other
process was issued from time to time to bring them all in and
service was finally made on Fredlock on the 9th day of Septem-
ber, 1899, the summons served upon him having been issued on
the 18th day of August, 1899.   It seems that, on the 30th day
of March, 1899, there was a meeting of some of the stockhold-
ers, for the purpose of attempting to continue the business
of the corporation, at which some of those who were directors
were removed, and J. C. Fredlock, E. B. Carney, Ralph Broad-
water, George W. Dusch and J. T. Carter were elected to fill
the vacancies, who, together with J. G. Hearne and F. D. Mc-
Coy, who were not removed, made the full number of directors.
On the 4th day of April, 1899, five of these held a meeting, at
which they removed from the office of president, James B. Mc-
Kee, and elected E. B. Carney, and Ralph Broadwater was
elected vice-president.    George W. Dusch was elected secretary
*pro tem,* and F. D. McCoy was elected treasurer.    Then a reso-
lution was adopted providing for the service of notice upon
McKee, Hook and Paull, that they had been removed from their
offices, and upon W. G. Wilkinson, the secretary, to the effect
that he should proceed to discharge his duties as such secre-
tary.    Another resolution was adopted providing for notice to
the attorney of the corporation to the effect that he should not
further represent it in any suit then pending wherein it was in-
terested, and another, authorizing the president  and secretary
*pro tem* to employ another attorney and institute such proceed-
ings as should be necessary to obtain possession of the office,
books, papers, funds and other property of the corporation.
All these motions were either made or seconded by said Fred-
lock.

The plaintiff in error had borrowed three thousand and five
hundred dollars from the building association and secured the
payment of it by a deed of trust upon his real estate in Min-
eral County.    This represented   thirty-five shares of stock.
He held an additional sixty-five shares of stock, and on these
he had borrowed seven hundred dollars, for which he had exe-

cuted his note and transferred said sixty-five shares to the association as collateral security. On this stock and on account of interest and premiums, he had paid to the association about two thousand and eight hundred dollars. It seems that, after the adoption of the resolution providing for the dissolution of the corporation, he purchased ten shares of stock from Carrie Barker, ten from M. D. Kern, and five from R. H. Helferstay, on which there had been paid about five hundred dollars. In September, 1898, he endeavored to obtain a settlement with the association by setting off against his indebtedness the withdrawal value of all these shares of stock, and paying the difference, but the representatives of the association declined to settle with him on that basis. On the 24th day of July, 1899, Fredlock conveyed to the Peidmont Feed and Ice Company, a corporation, organized by himself, W. W. Kerns, and David Brandenbury, who had been employes of his at his livery stable, Carrie Barker, who had been employed by him as bookkeeper and Taylor Morrison, who was his legal adviser in reference to his business with the building association, the real estate upon which he had secured the three thousand and five hundred dollars, borrowed from the association. The dues, interest and premium on his stock and loan having become in arrears, the association caused said real estate to be advertised for sale on the 23rd day of September, 1899. On the 19th day of September, Fredlock and the Peidmont Feed and Ice Company presented to the judge of the circuit court of Mineral County, their bill in equity, setting out, among others, the facts hereinbefore stated, and praying an injunction to prevent the sale of said real estate, and that an account might be taken to ascertain the indebtedness of Fredlock to the association, and that any illegal or usurious premium, interest or other charges made against him on account of said loans might be deducted. On the 9th day of February, 1900, the circuit court of Ohio County enjoined Fredlock and the Peidmont Feed and Ice Company from proceeding any further on said bill filed in the circuit court of Mineral County until the further order of said circuit court of Ohio County, and said injunction was served upon them on the 12th day of February, 1900. It appears from the affidavit of W. C. Clayton, who represented the building association in Mineral County, that, at

the June term of said court, he resisted the making of any decree, and that, at the April term, he filed a plea in said cause, and as a part of it, a certified copy of the decree made by the circuit court of Ohio County, February 9, 1900, and insisted that the building association ought not to be required to answer the bill filed against it in the Mineral County circuit court; and that, at the September term, Fredlock and the Peidmont Feed and Ice Company and their counsel urged the court to enter a decree, referring the cause to a commissioner. Such decree was made and entered on the 13th day of September, 1900. The circuit court of Ohio County has held that Fredlock, in obtaining said decree, in the circuit court of Mineral County, has disobeyed and violated the order of injunction made against him by the circuit court of Ohio County.

One of the first contentions is, that the hearing of the rule for the contempt should have been had in the criminal court of Ohio County. Section 27 of chapter 147 of the Code, by its very terms, is decisive of this question. That it vests in all courts the power to punish for contempt is clearly apparent. "The courts and judges thereof may issue attachments for contempts, and punish them summarily only in the cases following." Said section then specifies the cases and, among them, is this: "Disobedience or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court." In so far as this statute concerns the right to punish for contempts, it is merely declaratory of the common law. "The right of every superior court of record to punish for contempt of its authority or process is inherent from the very nature of its organization, and essential to its existence and protection and to the due administration of justice." 7 Am. & Eng. Enc. Law, (2 Ed.) 30. It is restrictive in this, that it limits the right to summarily punish for contempts to the cases specified. *State* v. *Hansford,* 43 W. Va. 773. While the proceeding is criminal in its nature, and the rules of evidence governing criminal trials are applicable, all contempts enumerated in said section 27, may be punished summarily. In such case, the proceeding is without indictment and without a jury, unless the court, in its discretion, should see fit to impanel a jury. The contemnor is not entitled to a jury. *State* v. *Hansford,* cited. The power to punish for

contempt and to entertain the proceeding is inherent in all courts. This Court, for which the law provides no means of impaneling a jury has that power and has exercised it. *State* v. *Bridge Co.,* 16 W. Va. 864; *State* v. *Frew & Hart,* 24 W. Va. 416. While it is true that, in case of disobedience to an order of a court of equity, the proceeding for contempt is entered and carried on in the name of the State on the law side of the court, after the return of the rule against the contemnor, (*State* v. *Bridge Co.,* cited, and *State* v. *Irwin,* 30 W. Va. 404), this seems to result from the statutory provision, allowing a writ of error for the review of a judgment in contempt cases. Code, chapter 160, section 4. This is not in conflict with the proposition that all courts are vested with power to punish for contempt. Our circuit court is a single court exercising both law and equity jurisdiction, and the proceeding is as effectual to vindicate and uphold the dignity of the court as a court of equity, as if the proceeding were had on the chancery side of the court. The spirit of the law on this subject is well expressed in the third point of the syllabus in *State* v. *Bridge Co.,* where it is said, of the power of the Supreme Court of Appeals to summarily punish for contempt: "Its right to do so is inherent and essential to the existence of the court; and the discretion involved in this power is in a great measure arbitrary and undefinable, and for a contempt of this character it has been in no degree restricted by our statute law." There is nothing in the contention that this case should have been heard in the criminal court of Ohio County.

Want of jurisdiction on the part of the circuit court of Ohio County to grant the injunction is also urged. This seems to rest upon two grounds: *First,* that the act enjoined was done in a county other than that of the court which awarded the injunction forbidding it; *second,* that the objects of the two suits were not the same, and the parties were different. The first is based upon sections 4, 6 and 9 of chapter 133 of the Code. These sections read as follows:

Sec. 4. "Jurisdiction of a bill for an injunction to any judgment, act or proceeding shall be in the circuit court of the county in which the judgment is rendered, or the act or proceeding is to be done, or is doing, or is apprehended, and the

same may be granted to a judgment of a justice in like manner and with like effect as to other judgments."

Sec. 6. "Every judge of a circuit court shall have a general jurisdiction in awarding injunctions, whether the judgment or proceeding enjoined be in or out of his circuit, or the party against whose proceeding the injunction be asked, reside in or out of the same."

Sec. 9. "Every order (awarding an injunction) made under the sixth or seventh sections, shall be directed to the clerk of such circuit court as has jurisdiction under the fourth section, and proceedings thereupon shall be as if the order had been made by such court, or the judge thereof."

It must be admitted that the injunction which lies at the root of this proceeding differs from the ordinary injunction. It is an order made by the court to uphold, maintain and protect a jurisdiction which attaches upon grounds wholly independent of the injunction. A suit in equity to wind up the affairs of a corporation, under a resolution providing for its voluntary dissolution, is the exercise of a jurisdiction which is undoubted and unquestioned, where the facts and conditions are such as to call for its exercise, and it is not intimated that they did not do so in the case in which this proceeding originated. All the assets of the corporation so dissolved really constitute a trust fund for the benefit of its creditors and stockholders. The court takes jurisdiction for the purpose of settling all equities among the interested parties and for the administration of the fund. In doing so, it exercises a universally acknowledged and well grounded jurisdiction, and, if the parties interested and brought within the jurisdiction of the court, in respect to all matters involved in the case, were permitted to institute proceedings in other courts, by which the assets would be wholly or partially withdrawn from the court having rightful jurisdiction of the whole matter, and whose jurisdiction has already attached, it would be powerless to perform its functions, in respect to that fund, settle and determine the equities of the parties and administer the trust. No such intention can be imputed to the legislature. While section 4 of chapter 133 says, "Jurisdiction of a bill for an injunction to any judgment, act or proceeding shall be in the circuit court of the county in which the judgment is rendered, or the act or pro-

ceeding is to be done, or is doing, or is apprehended," it is to be noted that this provision relates to a bill for an injunction. By its very terms, this statute does not extend to injunctions which are ancillary to a rightful jurisdiction of a subject matter which stands upon grounds wholly independent of the injunction. To hold that said section prohibits the awarding of the injunction in this instance, and under the conditions existing here, would carry the effect of said statute clearly beyond its terms. Not only that, but it would do so in direct invasion of a well established jurisdiction. "The court having jurisdiction *in personam* had power to require the defendant to do or refrain from doing anything beyond the limits of its territorial jurisdiction which it might have required to be done or omitted within the limits of such territory." *French* v. *Hay,* 22 Wall. 236. That was the case of a suit in equity to enjoin the collection of a judgment in one court, in aid of the jurisdiction of another court, proceedings in which were fatal to the action at law in which the judgment was recovered. Mr. Justice Swayne said it was not an original bill but an auxiliary and dependent bill. In addition to that, and what has been quoted from the syllabus, he said: "Having the possession and jurisdiction of the case, that jurisdiction embraced everything in the case, and every question arising which could be determined in it until it reached its determination and the jurisdiction was exhausted. While the jurisdiction lasted it was exclusive, and could not be trenched upon by any other tribunal." As bearing directly upon the question presented here, the following is found in the opinion in that case: "The prohibition in the Judiciary Act against the granting of injunctions by the courts of the United States touching proceedings in State courts has no application here. The prior jurisdiction of the court below took the case out of the operation of that provision." The same reasoning has direct application to this case. In *Lewis* v. *Darling,* 16 How. 1, Mr. Justice Swayne, delivering the opinion of the court, said: "It appears, then, from the admissions and proofs in this case, that the appellant has substantially under his control a large property of the testator, which we think from his will that he meant to charge with the payment of the plaintiff's legacy. *   *   *   *   But he states that the real estate is in another sovereignty than that in which the

plaintiff has sued, and is therefore out of the jurisdiction of this court to make any decree concerning it. It is true that the court cannot, in such case, order the land to be sold for the payment of any decree which it may make in favor of the plaintiff. But it is not without power to act efficiently to cause the defendants to pay any such decree." In *Peck* v. *Jenness,* 7 How. 612, Mr. Justice Grier said: "It is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. These rules have their foundation, not merely in comity, but on necessity. For if one may enjoin, the other may retort by injunction, and thus the parties be without remedy; being liable to a process for contempt in one, if they dare to proceed in the other. Neither one can take property from the custody of the other by replevin or any other process, for this would produce a conflict extremely embarrassing to the administration of justice." In *Wallace* v. *McConnell,* 13 Pet. 136, Mr. Justice Thompson says: "The jurisdiction of the District Court of the United States, and the right of the plaintiff to place his suit in that court, having attached, that right could not be arrested or taken away by any proceeding in another court. This would produce a collision in the jurisdiction of courts that would extremely embarrass the administration of justice." The same principle gives a court complete control of the subject matter, or the property involved in a suit, "when the object of the action requires the control and dominion of the property involved in the litigation, that court which first acquires possession, or that dominion which is equivalent, draws to itself the exclusive right to dispose of it for the purposes of its jurisdiction." *Heidritter* v. *Oil Cloth Co.,* 112 U. S. 294. See also *Railroad Co.* v. *Vinet,* 132 U. S. 485; *Stout* v. *Lye,* 103 U. S. 68.

Jurisdiction over all matters in the settlement of the affairs and business of the West Virginia Loan Company had been asserted by the circuit court of Ohio County, before any ac-

tion was taken in the circuit court of Mineral County. These matters included a deed of trust, held upon Fredlock's property by the association, the money borrowed by him from the association for which that property was bound, his liability to the association upon the stock for which he had subscribed, and the court had jurisdiction of him because he was made a party to the suit and process had been served upon him. The injunction, as already stated, had for its primary purpose the enforcement and vindication of that jurisdiction. Without power to enforce its jurisdiction, the circuit court of Ohio County would be at the mercy of any other court in which any of the parties might see fit to institute a suit. Thus, the systematic and equitable distribution of the funds would be broken in upon, the distribution delayed and beclouded with uncertainty, and one suit would but lay the ground for another, thus, entailing endless confusion and expense. That it was the legislative intent, in passing section 4 of chapter 133 of the Code, to thus impair the general jurisdiction of the courts, deny to them powers which are absolutely necessary to the effectual and orderly administration of justice, and bring about the confusion and disastrous results which have been indicated, cannot be entertained for a moment, in the absence of a clear and explicit expression of such intention. It is nowhere to be found in the statute upon which plaintiff in error relies.

As to the second ground assigned for want of jurisdiction, it is enough to say that, it being established that the circuit court of Ohio County had jurisdiction of the cause, to which the plaintiff in error was a party, and that he, in disobedience of an order of the court, prosecuted a suit in another county, the purpose and object of which was to trench upon the jurisdiction of the court having control of the case, it is not material whether the object of the second suit was the same as that of the first or not. The fact that the second suit had the effect to partially withdraw from the pending case in Ohio County a part of the subject matter to which its jurisdiction had attached, was sufficient to warrant that court in prohibiting him from aiding in the prosecution thereof. Disobedience of an order of a court, committed by a party to a suit in which the order is made, is an act of contempt which the court has power to punish. Such order and such disobedience may relate to some-

thing other than the pendency of another suit. So it may relate to a suit which is not, in all respects, the same as the suit in which the order is made. From what has been said in reply to other contentions, bearing upon the question of jurisdiction, it cannot be seriously doubted that the circuit court of Ohio County had acquired jurisdiction of the settlement of the affairs of the building association, and that plaintiff in error was a necessary party and had been served with process when the injunction issued. When a court has jurisdiction in the sense of power to decide whether an injunction or other writ shall be awarded, the party against whom it issues is bound to obey it, although the awarding of it may have been erroneous, and, in that sense, improper and improvident, and it may operate unreasonably and unjustly. He must obey it until vacated or dissolved. *State* v. *Bridge Co.,* 16 W. Va. 864, (Syl. 10); *Forrest* v. *Price,* 52 N. J. Eq. 16; *State* v. *Baldwin,* 57 Ia. 266; *Kaye* v. *Kean,* 18 B. Mon. (Ky.) 847; *Railroad Co.* v. *Ramsley,* 45 N. Y. 644, 654; *People* v. *McKane,* 78 Hum. (N. Y.) 161; *Simpson* v. *Putnam,* 41 Vt. 238; *Woodyard* v. *Earl Lincoln,* 3 Swanst. 626.

Finally, it is insisted that the judgment should be reversed for irregularities, mere errors in the proceeding, and insufficiency of evidence. It is very well established that a contempt of court is in the nature of a criminal offense, that its punishment is criminal in its character, and that the evidence must be sufficient to establish guilt beyond a reasonable doubt in order to convict. *State* v. *Bridge Co.,* cited; *Rule* v. *Rule,* 24 W. Va. 279; *State* v. *Irwin,* 30 W. Va. 404; *State* v. *Ralphsnyder,* 34 W. Va. 352; *State* v. *Cunningham,* 33 W. Va. 607. The theory presented in the brief for plaintiff in error seems to be that it was necessary to impanel a jury and bring witnesses to testify in person. This position is not tenable. Where the courts have the right to summarily punish for contempt, they proceed without an indictment and without a jury. 7 Am. & Eng. Enc. Law, (2d Ed.) 66; 4 Enc. Pl. & Pr. 771. By so proceeding, the constitutional guaranties relating to indictment and jury trial are not violated. 4 Enc. Pl. & Pr. 771; 7 Am. & Eng. Enc. Law (2d Ed.) 66. Nor is it necessary that the accused be confronted by the witnesses against him. In *State* v. *Bridge Co.,* cited, the evidence was in the form of affidavits,

just as is a part of the evidence in this case. The matter set forth in the two affidavits is denied in the answer to the rule, but that presents nothing more than mere conflict of testimony with which courts and juries often have to contend. The principal reliance, however, is upon the claim that the plaintiff in error, after the injunction was served upon him, was powerless to prevent the decree subsequently made by the circuit court of Mineral County, because the Peidmont Feed and Ice Company was also a plaintiff in that suit and had the right to proceed. It is also denied that the plaintiff in error procured, or in any way encouraged, the entering of that decree. It is not claimed for the answer of Fredlock that it amounts to anything more than a denial of the charge made against him and an argument in support of that denial. The record, as made up in the circuit court of Ohio County, discloses evidence strongly tending to prove the charge. Nothing is offered against it except the denial by Fredlock, on oath, of his guilt. He introduced no evidence. It appears from the copy of the minutes of the meeting of the directors, that Fredlock was bitterly opposed to the dissolution of the corporation, and the pending suit for winding up its affairs. While that suit is not mentioned in the minutes, it is very clear that the purpose and object of the meeting was to prevent dissolution and provide for the continuance of the business of the association. It is preposterous to say that men so engaged had no knowledge of the important fact of the pendency of a suit, the purpose of which was to put an end to the existence of the corporation. The record also disclosed a letter from Fredlock's counsel, dated July 1, 1899, in which the determination to liquidate and wind up the affairs of the company, the steps taken to that end, the election of the new board of directors and their claim that the old board had no right to collect and handle the funds of the association, are referred to. In that connection, the letter says: "The matter is now in the hands of the court, as I understand it, and until this dispute, as to who is the proper person to receive the money, is settled I cannot advise Mr. Fredlock to pay off his loan either in full or in part, though if we can determine the correct amount due from Mr. Fredlock and you can give him some sort of security against having to pay the money over a second time, should the court finally decide against the old

board, I will advise Mr. Fredlock to pay off the loan and he will be glad to do so, as he is anxious to be rid of it and have his property clear." It is not pretended that there was any suit pending relating to the affairs of the company except the one brought to wind up its business, but it is insisted that the reference in this letter to the matter, as being in the hands of the court, only related to the dispute between the two boards of directors. Notwithstanding the denial of knowledge of the pendency of the suit and its object, it certainly cannot be questioned that this is competent evidence, tenuing to show such knowledge. And a fair inference is, that the character of the suit was known, as it was written by Fredlock's attorney who may well be supposed to have ascertained a fact of such importance and publicity as a pending suit involving the matter about which he was employed. Furthermore, the letter, together with the conduct of Fredlock, shows a desire, purpose and intent, not to submit himself and his interest to the determination of the controversy in that suit if he could avoid it. After repeated attempts to obtain a settlement upon advantageous terms, proposed by himself, he joined in the organization of a corporation composed principally of persons who have been closely associated with him, and conveyed his property to it, with the understanding that it should assume and pay his indebtedness to the association. The good faith of this transaction is impeached by the fact that, although he had parted with all interest in the property and relieved himself of liability to pay the indebtedness secured upon it, or rather had taken indemnity against loss on account of it, he joined this corporation as plaintiff in a suit to enjoin the sale of the property and to have the usury in the debt due the association eliminated, and to have credited upon the debt the value of certain shares of stock purchased by him from other parties. The object of said suit was to obtain against the association, its stockholders and creditors, the settlement, advantageous to himself, which he had endeavored to obtain out of court. How could the corporation ask credit for the value of shares belonging to Fredlock? Moreover, it is perfectly clear on the face of the transaction, viewed in the light of the circumstances surrounding it, that Fredlock was the prime mover and organizer in the creation of the corporation and was vitally interested in what it

was attempting to do. After it had been decided by the stockholders to dissolve the corporation, and after Fredlock had attempted to obtain a settlement, he purchased twenty-five shares of the stock of the association. The bill filed in Mineral County shows that he attempted to obtain the settlement in September, 1898, and these twenty-five shares of stock were transferred to him in February, 1899. His resistance to the dissolution, his attempt to settle, his purchase of additional stock with intent to have it credited upon his indebtedness, his organization of the corporation, his conveyance of his property to that corporation and his joining as plaintiff in the suit brought in Mineral County in conflict with the proceedings pending in Ohio County, are all facts clearly tending to show an intention on his part to prevent an adjudication of his rights in the premises by the circuit court of Ohio County. This is an inference fairly arising from these facts and others which have been stated herein, tending to show the guilt of Fredlock. Surely, it cannot be claimed that they are not to have any weight against him, and that a proceeding for contempt is one in which circumstantial evidence cannot be considered. It is competent evidence in all other crimnial proceedings, and why not in this? While Fredlock denies having assisted in procuring the decree of reference in the Mineral County suit, there is one clause in that decree which concerns the rights and interests of Fredlock only. It is shown that he purchased twenty-five shares of stock from other persons, and it does not appear that he sold these shares to the Piedmont Feed & Ice Company. The decree directs the commissioner "to ascertain and report the amount that has been paid to said company on the certificates of its stock, assigned to and held by said Fredlock." Who but Fredlock was interested in having this provision inserted in that decree? The Piedmont Feed and Ice Company had no interest whatever in those shares. The answer to the rule does not undertake to make any explanation whatever of this incontrovertible fact which is inconsistent with his denial of the charge of having procured the entry of that decree. He does not say that it occurred by inadvertance even. Had he done so, the statement should have been closely scrutinized for the reason that, before that time, the restraining order of the circuit court of Ohio County had been served upon him expressly prohibiting

his further prosecution of that suit. That made it his duty
to see to it that no further steps were taken in a matter over
which he had control. This provision in the decree is competent
evidence of the actual violation of the injunction order and, in
view of the absence of any attempt in the answer to explain it
or account for its presence there, common sense and reason must
treat it and the other damaging facts alluded to as fairly es-
tablishing the responsibility of Fredlock for all the proceedings
in Mineral County, which were manifestly prosecuted for no
other purpose than to try to obtain advantage by withdrawing the
Fredlock interest in the loan association from the jurisdiction
of the circuit court of Ohio County. The evidence found in the
record, while circumstantial, discloses the motive for the com-
mission of the act charged, previous conduct on the part of the
plaintiff in error tending to show an intent on his part to com-
mit it, and the actual accomplishment of the thing which was
forbidden. All this is indisputable.

But there is an intimation in the brief that the circuit court
of Mineral County, having before it the decree and injunction
order, made by the circuit court of Ohio County, by allowing
plaintiff in error to proceed as he did, adjudicated his right to
so proceed and thus took out of the act the element of disobedi-
ence. It is well known that the action of the court, in restrain-
ing a party to a cause pending in one court from prosecuting
a suit in another court, does not, in any way, affect the juris-
diction of such other court. Therefore, the circuit court of
Mineral County, being required to look no further than to as-
certain its own jurisdiction in the premises and the rights of
the parties as determined by the pleadings and evidence in the
cause pending in it, had no ground upon which to refuse the re-
lief asked. The injunction order laid before it, did not re-
strain the court from proceeding. It was not the duty of that
court to determine whether Fredlock was bound to obey the
order of the other court. That question was not submitted to
that court. It related to Fredlock only and not to the court.
Hence, the action of the court in entering the decree determined
nothing, as between Fredlock and the State or the circuit court
of Ohio County. "The injunction is directed, not to the court,
but to the litigant parties, and in no manner denies the juris-
diction of the legal tribunal. It merely seeks to control the per-

son to whom it is addressed, and to prevent him from using the process of courts of law where it would be against conscience to allow him to proceed. It is granted on the ground that an unfair use is being made of the legal forum, which, from circumstances of which equity alone can take cognizance, should be restrained lest an injury be committed wholly remediless at law." High. Inj., s. 45; 10 Am. & Eng. Enc. Law, 910, *n* 1. While this relates to injunctions against proceedings in courts of law, the extent to which one court of equity restrains a party to a suit pending in it from proceeding in another court of equity must be exactly the same, for the same reasoning applies.

Based upon this decree is the further argument that the element of intent to disobey the injunction order or to contemn the court is lacking. Where the act of contempt is disobedience of an order of the court, the contemnor is not permitted to say his violation of the mandate of the court was unintentional. In such case he cannot purge the contempt in that way. 4 Ency. Pl. & Pr. 791, and cases cited in note 3. The averment of want of intention only serves to mitigate the punishment. *Id.* There are, no doubt, contempts which may be purged in that way, where the facts and circumstances support the averment and negative the idea of intentional wrong, but in cases of this kind, the gist of the offense is the doing of the act forbidden, and not the intent with which it is done.

Upon the evidence, the circuit court has found for the State, and it cannot be said that there is not sufficient evidence to support the finding. No ground upon which a reasonable doubt of guilt could be predicated is perceived. The judgment must be affirmed.

*Affirmed.*