# CHARLESTON.

STATE *ex rel.* CONTINENTAL COAL COMPANY *v.*
VAN A. BITTNER

(No. 5509)

Submitted November 16, 1926.   Decided December 14, 1926.

1. CONTEMPT—*Section 4, Chap. 160, Code, Relating to Review by Writ of Error to Judgment in Contempt for Disobedience to Lawful Order or Decree, When Read in Pari Materia With Sec. 3, Art. 8, Constitution and Sec. 135, Code, Does Not Preclude Review of Judgments in Criminal Contempt by Writ of Error, Where Freedom Involved.*

    Section 4, Chap. 160, Code, relating to review by writ of error to judgment in contempt for disobedience to a lawful order or decree, when read *in pari materia* with Sec. 3, Art. 8, Constitution, and Sec. 1, Chap. 135, Code, does not preclude review of judgments in criminal contempt by writ of error, where freedom is involved.   (p. 684.)

2. SAME—*Trial for Criminal Contempt is Quasi Criminal Proceeding, and Rules of Evidence in Criminal Trials Apply Thereto. In Such Trial Guilt of Accused Must be Proved Beyond Reasonable Doubt.*

    A trial for criminal contempt is a quasi criminal proceeding, and the rules of evidence in criminal trials apply thereto. In such trial the guilt of the accused muse be proved beyond reasonable doubt.   (p. 689.)

3. SAME—*Under Paragraph 4 of Sec. 27, Chap. 147, Code, Circuit Court Has Power to Punish Summarily, Without Trial by Jury, as for Contempt, Any Person Who Has Disobeyed or Resisted Lawful Decree or Order of That Court.*

    Under paragraph 4 of Sec. 27, Chap. 147, Code, a circuit court has power to punish summarily, without trial by jury, as for a contempt, any person who has disobeyed or resisted a lawful decree or order of that court.   (p. 686.)

Error to Circuit Court, Monongalia County.

Proceeding for contempt of court, State ex rel. Continental Coal Company against Van A. Bittner. Judgment for plaintiff, defendant brings error.

*Reversed and remanded.*

*Eugene H. Long* and *T. C. Townsend,* for plaintiff in error.
*E. M. Showalter* and *C. A. Goodwin,* for defendant in error.

LIVELY, JUDGE:

This writ is to review the judgment and sentence of the circuit court pronounced on the 11th day of June, 1925, in which Van A. Bittner, plaintiff in error, was adjudged to be in contempt of the court in that he did not perform or obey an injunction lawfully issued by that court. He was fined $500.00 and costs, and ordered to be confined in jail for six months.

In the early part of 1925 a strike of the United Mine Workers was in progress. Van A. Bittner as chief representative of the United Mine Workers of America in Northern West Virginia, had issued an official call for the strike on March 13, 1925, directed to all miners working in the non-union mines of Northern West Virginia, and was in active conduct of an organization campaign at the non-union mines in that part of the State. The strike was to be effective as of April 1, 1925. The Continental Coal Company was operating a non-union coal mine on Scotts Run in Monongalia County, about 28 miles from the City of Fairmont in Marion County; and filed its bill in the Circuit Court of Monongalia County against the officers of the United Mine Workers and various other persons as members, agents and representatives, including Van A. Bittner, and against various local unions affiliated with the United Mine Workers of America, in which it charges, among other things, that defendants have entered into an unlawful conspiracy to prevent complainant from operating its mines, and to that end some of them in pursuance of the conspiracy have been threatening, coercing and intimidating its employees by various means therein stated from working for complainant at its mines; that they have made inflammatory speeches and congregated in great numbers in and around the mines, and by threats to kill, have caused a number of its employees to quit work, and that by such methods all of its employees will cease to labor for complainant, to its irreparable loss and total ruin, unless defendants are restrained from so doing. Numbers of individual and specific instances of threats and intimidation against complainant's employees are recited. It would be useless to de-

tail all of the unlawful acts charged against defendants, all in pursuance of the conspiracy to ruin complainant, set out in the bill.

An injunction was issued upon the bill on April 27, 1925, prohibiting the defendants and each of· them and all other persons confederating, combining and conspiring with them from in any manner or way whatsoever, by use of threats of personal injury or violence, from interfering with complainant's employees, or those seeking employment with it, or by enticement or persuasion causing them to leave complainant's service, or preventing others from entering its service, aiding or encouraging any person in the performance of said unlawful acts or doing anything whatever in furtherance of the conspiracy or combination to ruin complainant; or in any manner aiding or abetting any person in the commission of said unlawful acts, or from entering plaintiff's premises, or injuring or destroying its property, or from taking any steps whatever to unionize the mine by means of threats, menaces, intimidation, force or violence, or in any way interfering with the contracts existing between complainant and its employees. This is the substance of the injunction order.

It appears that there had been "marches" in the near vicinity of complainant's mines at the hours when its employees came to their labors in the mines, said "marches" being composed of two or three hundred persons; and it further appears that the mines were picketed. These marches and the picketing had begun when the injunction was granted, and continued almost daily until about the 8th of May following, when they ceased upon issuance of citations or rules in contempt issued and served.

On May 3, 1925, while this condition at plaintiff's mines existed, Van A. Bittner made a public address to about 1500 union miners and others in the City of Fairmont, about twenty-eight miles from complainant's mines. His language in that address is the basis of this proceeding against him. On the following day Bittner went to the City of Wheeling to answer contempt proceedings against him pending in the United States District Court. On May 18th, a rule in con-

tempt was issued by the Circuit Court of Monongalia County against him, to which he appeared on May 27th and entered into a recognizance for his later appearance, and on June 19th, he appeared and answered the rule. Evidence was then taken, and the judgment and sentence above set out was rendered on the following day.

The language used by Bittner in the public address, as testified to by several persons who took notes of what was said during the progress of the address, is:

"Judge Lazelle in Monongalia county has granted an injunction. I say this to Judge Lazelle and every other judge in the state and nation, they can issue as many infernal injunctions as they please and whenever they interfere with our lawful rights we will disobey them. I realize all I say and the bearing it has as I am now in the federal court for disobeying an injunction. Well all I can say to Judge Baker is this, all the infernal injunctions he can issue can't break the United Mine Workers of America. The United Mine Workers of America will be prosperous here when the injunction of December 23, 1923, is rotting before God. My mother and wife and little girl don't want to see me in jail. But they would rather see me in jail than cowing down before some Judge. So if Judge Baker wants to send me to jail next Tuesday, all right. What insolence is there in official robes that would send a man to jail for violating an injunction!"

Senator R. A. Pollock testified that Bittner said in the course of his speech that he (Bittner) expected every fellow to get out in the line and do his duty or he would not get his benefits. A fairly full report of the speech was printed in the public press the following day. The speech shows an intimate knowledge of the local happenings in relation to the strike and the activities of those opposed to it. It was in furtherance of the strike, and tended to stir up a bitter feeling.

Bittner's answer to the rule admits the pendency of the chancery bill and the issuance of the injunction; admits that he is a member of the miners' organization and its representa-

tive; but he denies having entered into the conspiracy to destroy property and business of complainant as charged; denies that he aided, counselled or abetted the unlawful acts alleged to have been committed by members of his organization; admits that he made the public address on May 3rd to a large audience in Fairmont, but denies that he therein advised any one to disobey injunctions in general or this one in particular; denies that he had any knowledge of this particular injunction, and denies the use of the language attributed to him above set out; and denies that he ever intentionally violated the injunction.

The parties went to proof. The bill and injunction were introduced in evidence. The injunction order was served on Toney Teti, designated in the bill as Board Member of District No. 17, United Mine Workers of America (said District No. 17 includes W. Va.), on James McCleary, Vice President of Sub-district No. 4, and upon James L. Studdard, President of Sub-district No. 4, and also upon Charles F. Davis, International Representative of the U. M. W. of A., and its financial agent for Northern West Virginia, on April 30, 1925; and upon Bittner on May 4th and 5th, 1925.

The evidence shows that between April 1st and the time of the issuance of the injunction order on April 27, 1925, a body of men ranging from 100 to 250 in number congregated at plaintiff's mine on Scotts Run in the mornings when its employees came to work, and by threats and intimidation scared the employees so that many of them quit work and the employment. Fifty-six quit in one day. Assaults were made on non-union miners in that vicinity, and plaintiff's employees who stopped work gave as a reason for so doing that they were afraid. Plaintiff had in its employment between 250 and 300 men. These marchings in increasing numbers and results continued until May 8, 1925, when a number of the marchers were served with rules in contempt.

The language used by Bittner is reasonably well proven, as well as the general tenor of his address. The newspapers immediately gave it prominence and wide circulation. Charles F. Davis, International Representative of the U. M. W. of A.,

acting as financial agent in Northern West Virginia, arranged the meeting, acted as chairman, and introduced the speakers, among whom was James McCleary. The opera house was full of striking miners, their wives and children, and spectators. It is not shown that any of the persons who were participating in the marches and picketings on Scotts Run were present or heard the speech; nor does it appear that they were ever advised of its purport and tenor. The number of marchers increased, it is true, up until May 8th, when there were in the march at plaintiff's mine about 400 persons.

Bittner's evidence is substantially that set out in his answer to the rule in contempt. He says he did not make the remarks attributed to him; that he was discussing injunctions generally as one of the problems confronting labor disputes, and the attitude of prominent officials and judges towards injunctions in such cases; that he had no knowledge of the injunction in this case; that he meant no disrespect to Judge Lazelle or his court; that his reference to Judge Lazelle's injunction applied to other injunctions issued by that jurist many months before in one or two cases. He said he had not counselled or abetted in any way the marchings and depredations on Scotts Run; that none of the members of his organization had advised him of such; but that he had heard of them. In answer to the question "From whom did you hear, who talked to you?" he said, "Everybody, nearly. I read it in the newspapers." He admitted that he was chief executive officer of the strike in that field. The circuit clerk said an injunction had been issued in 1922 at the instance of New England Fuel & Transportation Co.; that three other injunctions were issued in 1924 at the instance of the Diamond Coal Company, Chaplin Colliers Company and Brady-Warner Company, all of which were still in force; and counsel agreed that all these injunctions were directed against the United Mine Workers of America and its various officers, local unions and members, and all were of the same general nature and effect as the injunction alleged to have been violated and disobeyed. Davis, the remaining witness for Bittner, says he was chairman of the meeting, heard the address, and heard

Bittner say that there had been various injunctions issued by Judge Lazelle and other judges. His interpretation of the remarks, although he could not give the precise language, was that they were of a general nature, and were not in disrespect of the courts. He says he was served with the injunction on April 30, 1925, but did not speak to Bittner about it, until after the meeting at which the address was made. This is a fair summary of the evidence; and counsel for Bittner contend that the evidence does not warrant a judgment of contempt.

The principal points of error relied upon for reversal are: (1) that the alleged contempt is a constructive criminal contempt and proof beyond reasonable doubt is necessary for conviction, and that the evidence fails in that regard; (2) that the evidence fails to show any knowledge on the part of Bittner of the injunction, either by actual service or otherwise, at the time he made the address; (3) that the language used did not violate the injunction, and therefore defendant could not be punished summarily, and could be proceeded against only, if at all, by indictment and jury trial.

It will be observed that these points of error involve the sufficiency of the evidence, especially the first two points; and the evidence is incidentally involved in a consideration of the third point, for the time, setting, and surrounding conditions and circumstances under which the language was used must be looked to and considered in construing the intent of the speaker to obey or disobey the court's injunction.

We are met at the threshold by the motion of the State to dismiss this writ as improvidently awarded, on the ground that we have no jurisdiction to review, and therefore cannot consider the weight and sufficiency of the evidence. Logically this challenge of our jurisdiction to review by writ of error is first in order. It presents a very serious question, and must be answered by our basic and statutory law. Our jurisdiction is appellate, except in habeas corpus, mandamus and prohibition. Const. Art. VIII, Sec. 3. Courts derive their authority and powers from the constitutions and laws, and unless the authority and power is found therein, the act of a

court is coram non judice. *N. & W. Ry. Co.* v. *Pinnacle Coal Co.,* 44 W. Va. 574. Under Sec. 27, Chap. 147 of the Code, courts and judges thereof may punish summarily any officer of the court, juror, witness or *other person for disobedience or resistance to a lawful decree or order of the court,* as for a contempt. By Sec. 4, Chap. 160, Code, a writ of error lies from this court to a circuit court in judgments for contempt of court, "other than for the non-performance of, or disobedience to a judgment, decree or order." At common law there was no review to a judgment for contempt. *Ex parte Kearney,* 7 Wheat. 38, 5 L. Ed. 391. The language of Blackstone was quoted in that case as follows, "The sole adjudication of contempt, and the punishment thereof, belongs exclusively, and without interfering, to each respective court." See 13 C. J. Sec. 155, page 97 and cases cited; *Smith* v. *Smith,* 81 W. Va. 761, 769. We are governed by the principles of the common law in force at the adoption of our Constitution, until altered or repealed by the legislature. Const. Art. VIII, Sec. 21; Code, Chap. 13, Sec. 5.

Said Section 4, Chap. 160, provides for review by writ of error in judgments for contempt other than for disobedience to a decree or order; and seemingly leaves such contempts (of orders and decrees) as at common law with respect to review by an appellate court. Bittner's counsel argue that this statute should be construed to prevent appeals only in civil contempts where the party offending has power to purge himself of contempt by obeying the decree or order—where "he has the key to his jail."

Some of the states, notably Conn. (*Rogers Mfg. Co.* v. *Rogers,* 38 Conn. 121); Fla. (*Caro* v. *Maxwell,* 20 Fla. 17); and N. C. (*Weston* v. *Lumber Co.,* 158 N. C. 270), follow the common law rule even in civil contempts. California and Idaho have statutes which adopt the common law. In a majority of the states the right to review has been given by express legislation or judicial construction even in cases of civil contempts. Thus in New Jersey appeals were denied in criminal contempts prior to 1909, when the legislature met the decisions by legislation. *Staley* v. *Realty Co.,* 83 N. J.

Eq. 300. In the federal courts a judgment in criminal contempt is reviewable. *Re Christensen Engineering Company,* 194 U. S. 458, 48 L. Ed. 1072. In the Virginias a right of review seems to be accorded in criminal contempts. *B. & O. R. R. Co.* v. *City of Wheeling,* 13 Grat. 57; *State* v. *Irwin,* 30 W. Va. 404; and *Craig* v. *McCulloch,* 20 W. Va. 148, 153, where Judge SNYDER says: "Proceedings for the punishment of contempt are in their nature criminal, and while an appeal to this Court lies in cases of conviction, no appeal lies from an acquittal." It may be observed that the decisions of other states on the question of review of judgments for contempt are colored by the various statutes and organic laws. Our attention has been directed to the forceful provision of our Constitution which says the appellate jurisdiction of this court shall include cases involving freedom or the constitutionality of a law. Art. 8, Sec. 3; and to Sec. 1, Chap. 135, Code, which has the same provision. Reading this part of the Constitution, Sec. 1, Chap. 135, Code, and Sec. 4, Chap. 160, Code (which latter section seems to deny writ of error to judgment for contempt for violation of a lawful court order), all *in pari materia,* we have come to the conclusion that we have jurisdiction to review, because in this case freedom is involved. The sentence is that Bittner be confined in jail six months. It will be observed that in *Smith* v. *Smith,* 81 W. Va. 761, on which the state relies in part to defeat jurisdiction to review, there was no question of freedom involved. The order in that case required payment of alimony. The contemnor had the "key to his prison." It will also be observed that freedom was not involved in *State ex rel.* v. *B. & O. R. R. Co.,* 73 W. Va. 1, which involved a judgment in contempt for violation of an injunction and was dismissed as improvidently awarded. The courts make a distinction between criminal and civil contempts. Where the proceeding is to preserve the power and dignity of the court, and to punish for violations of its order, it is criminal and punitive in its nature, and the government is vitally interested in the prosecution. Such contempts lessen respect for the courts, and weaken their power. The government can not continue

unless the courts can function and compel obedience to their lawful orders. The legislature cannot take from the courts this inherent right. On the other hand, those proceedings instituted to enforce the rights of private persons and to compel obedience to lawful orders made for that purpose, are civil, remedial and coercive in their nature, and the chief interest therein is confined to the parties to the suit. *Bessette* v. *Conkey*, 194 U. S. 324, 48 L. Ed. 997. These are classed as civil contempts. In the instant case the contempt alleged, bears a double aspect. The Coal Company desired to punish Bittner as a preventive measure to stop future instigations to destroy the operation of its mine; and the State was interested in upholding due respect for and obedience to the order of one of its basic divisions of government. It seems to the writer that the distinction between criminal and civil contempt is of little real importance. Both are violations of the court's order, and strike at the power, dignity and authority of the court. Both are subversive of good government. The contemnor disregards the command of organized society proceeding through its court, relying for justification upon his own judgment although in violation of the established forms of law. When the courts cease to function in full force and vigor, society will revert to its primitive order. However, the proceeding in this case gives it the character of a criminal contempt, a distinct thrust at the court. Imprisonment for a fixed term was imposed, and by analogy with the criminal law, makes it criminal and punitive in its nature.

Having concluded that we have jurisdiction to review, what shall be the extent and scope of review? The courts are not in full accord in this regard. 13 C. J. sec. 168, page 104 gives a general summary of the various decisions, and it may be well to quote it, "As a general rule, a reviewing court in contempt proceedings will not consider pure questions of fact, although it has been held that the findings by the lower court in contempt proceedings are not conclusive on appeal, but that the appellate court will give the same force to the trial court's findings in cases of contempt as in other cases where there is a conflict in the evidence, and that where there is evidence tending to

show the guilt of defendant a finding of guilty will not be reviewed. The court, however, may determine whether the alleged contemptuous conduct constitutes a contempt in law. An exception to the general rule has been made in chancery proceedings to punish for the violation of an injunction, and the court in such case will look to the merits as disclosed by the facts, although even in these cases the decision of the lower court will not be disturbed if there is reasonable evidence to support the judgment; and according to some authorities the decision of the lower court adjudging a party guilty of contempt in violating an injunction will not be disturbed on appeal unless the evidence convinces the court on appeal beyond a reasonable doubt that he is not guilty.'' Whatever may be the rule in other states, we are committed to the rule that the evidence in trials for contempt for violating an injunction must be sufficient to establish guilt beyond a reasonable doubt. *State* v. *Davis,* 50 W. Va. 100. And in *State* v. *Ralphsnyder,* 34 W. Va. 352, we held that in a proceeding for criminal contempt the same principles of evidence apply as in other criminal cases and the guilt of the respondent must be proved beyond a reasonable doubt, approving and following *State* v. *Cunningham,* 33 W. Va. 607. And there is much authority that in cases of criminal contempt the evidence must be, in order to convict, sufficient to convince the mind beyond reasonable doubt of the actual guilt of the accused. 13 C. J. page 77, Sec. 112, citing many cases, including *State* v. *Ralphsnyder, supra.* Bearing this rule of evidence in mind, we have hereinbefore set out at unusual length the evidence. From this evidence it appears that there was a lawful order of injunction issued on the 27th of April, 1925, in the case of *Continental Coal Company* v. *John Zyknoff* and others, including Bittner, James McCleary, Charles F. Davis, Toney Teti, James L. Studdard, and the United Mine Workers of America, prohibiting them, among other things, from interfering with plaintiff's business by using force, intimidation or persuasion to induce its employees to break their contracts or leave its works, or entering upon plaintiff's premises for such purposes; and from

ordering, directing, aiding or assisting or in any manner abetting any person committing any or either of the unlawful acts aforesaid; that this injunction was served on Toney Teti, James McCleary, John L. Studdard and Chas. F. Davis on April 30th, and upon Bittner on May 4th and 5th, 1925. On May 3rd, Bittner made the speech at Fairmont, twenty-eight miles from Scotts Run, using the language above quoted. While he had knowledge of the marchings on Scotts Run derived from newspaper reports and from individuals not connected with his union, he denies positively that he had any notice that Judge Lazzelle had issued the injunction of April 27th. He says he had reference to an injunction which had been issued in another case several months before. There is no positive proof that he did know of the injunction in question. The circumstances create a strong suspicion that he did know. He was the man in charge of the strike, the executive officer in Northern West Virginia. His associates above named had been served. James F. Davis who had been served on April 30th arranged the meeting at which the speech was delivered, and presided at the meeting. But he says that he did not tell Bittner of the injunction until afterwards. Bittner was not in the immediate vicinity when the injunction was issued, but was in another part of the state. Suspicious circumstances are not sufficient to convict in a criminal case. *State* v. *Bennett,* 93 W. Va. 548; *Prather* v. *Commonwealth,* 85 Va. 122; 4th Ency. Dig. Va. & W. Va. Repts. page 91. Possibly the trial judge considered the circumstances as being so cogent and convincing as to overcome the contemnor's denial of knowledge, the court being influenced by and justly indignant at the language used as detailed. The language indicates contempt for any injunction issued by any court in an industrial dispute. It was calculated (if not designed) to inflame the hearers and to incite them to violate all such injunctions. It cannot be too severely condemned, made as it was under the circumstances and at the time when rumors of burnings, assaults, shootings and destruction of property were rife, and open armed warfare likely to break out, calling for martial law. And had there

been evidence beyond a reasonable doubt that Bittner knew of the injunction, we would not hesitate in affirming the judgment, but we find it wanting in this respect; and giving him the benefit of the doubt, we have come to the conclusion to reverse the judgment.

On the third point of error, namely, that Bittner should have been tried under indictment and by jury, we cannot agree. In a proceeding for a contempt of court for disobedience to its lawful order or decree there is no constitutional right of trial by jury involved. It may be tried by the court summarily. *State* v. *Fredlock*, 52 W. Va. 232, 243; 4 Ency. Plead. & Prac. page 789; 6 R. C. L. Sec. 35, page 522; 7 Am. & Eng. Ency. of Law (2nd Ed.) page 66. Trial without jury in such cases is "due process of law" within the 14th amendment to the Constitution of the United States. *Eilenbecker* v. *Plymouth Co.*, 134 U. S. 31.

The judgment will be set aside and the case remanded.

*Reversed and remanded.*