JAMES BLAINE HENDERSHOT, SR.

*v.*

THE HONORABLE JOSEPH M. HANDLAN,

*Judge, etc.*

(No. 14110)

Decided October 18, 1978.

*Hague, Rudolph, Hague & Lantz, Eugene T. Hague, Sr., and George E. Lantz* for relator.

*Joseph M. Handlan* pro se.

CAPLAN, CHIEF JUSTICE:

In this original proceeding in prohibition the petitioner, James Blaine Hendershot, Sr., seeks a writ prohibiting the respondent, Joseph M. Handlan, Judge of the Circuit Court of Wood County, from conducting a trial and proceeding further against the petitioner in a contempt matter now pending in said court.

This controversy arises as a result of a divorce action instituted in October, 1976 by James Blaine Hendershot, Jr., the son of the petitioner, against Jennie Lou Hendershot. A preliminary hearing was held on July 11, 1977, during which the court heard testimony from witnesses for the parties and from the parties themselves. At the conclusion of that hearing the court awarded custody of the infant daughter to the mother, Jennie Lou.

The order awarding such custody was entered on July 12, 1977 and, after providing for support money for the child and attorney's fees, proceeded as follows: "The Court having learned that the Plaintiff, James Blaine Hendershot, Jr. did not turn over to the Defendant, Jennie Lou Hendershot, the infant child of the parties ... and further that the grandparents, James B. Hendershot, Sr. and Anna Hendershot, his wife, have absconded with the child ... the Court does direct the Clerk of the

Circuit Court ... to issue a capias to the Sheriff ... or any other law enforcement officer ... to forthwith arrest and apprehend James Blaine Hendershot, Jr., James Blaine Hendershot, Sr. and Anna Hendershot ... and deliver the same to Joseph M. Handlan, Judge ... whose office is located in the Wood County Courthouse ... to hear the Court's Judgment."

As a result of the July 12, 1977 order a capias was issued and, on November 6, 1977, James Blaine Hendershot, Sr. was arrested and incarcerated in the Wood County Correctional Institution. Bond was imposed in the amount of $20,000.00 which he posted on November 7, 1977, after which he was released. The bond was to secure his appearance before the circuit court on December 15, 1977 to show cause why he should not be held in contempt of court.

The Circuit Court, by order filed November 22, 1977, directed the infant's mother, Jennie Lou Hendershot, to file a contempt petition charging James Blaine Hendershot, Jr., James Blaine Hendershot, Sr., and Anna Hendershot with contempt of court and directing them to appear before said court on December 15, 1977 to show cause why they should not be held in contempt. The contempt petition was filed on November 22, 1977 and, on that same day, the court set December 15, 1977 for a hearing on the matter.

On December 6, 1977 several motions were filed by the petitioner, one of which moved the disqualification of Judge Handlan. By reason of his illness, the petitioner, on December 13, 1977, filed a motion for a continuance. The motion for a continuance was granted and the matter was continued to January 19, 1978. Motions for a bill of particulars and for discovery were granted but motions for a jury trial, dismissal and disqualification were denied. This proceeding in prohibition followed.

Petitioner raised the following questions:

1) can the court punish petitioner in contempt for an alleged violation of a court order when he was not a party to the proceeding?

> 2) does the fact that petitioner was arrested pursuant to a capias issued at the court's instance preclude subsequent proceedings against him where he had no notice of any charge having been made against him prior to his arrest?

While petitioner was not a party to the divorce proceeding, he was a witness at the hearing and the pleadings disclose that he had actual notice of the court's decision to award custody of the infant to the mother. It seems apparent that because of his relationship to his son and, having physical custody of the child, he was acting in concert with him to frustrate the court's order. A person may be adjudicated in contempt of court for violating an order of which he has actual knowledge, notwithstanding that at the time of the violation the order had not yet been formally drawn up. *Belden v. Scott*, 150 Ohio St. 393, 83 N.E.2d 58 (1948). Likewise, a person not a party to the proceeding who had actual knowledge of the court's order may be charged with contempt for violating such order if he is acting in concert or privity with a party. *Chase National Bank v. City of Norwalk*, 291 U.S. 431 (1934); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2nd Cir. 1930).

*W.Va. Code*, 1931, 61-5-26, provides that courts and judges thereof may issue attachment for contempt and punish them *summarily* only in the instances enumerated therein. Contempt may be civil or criminal. Where the primary purpose is to preserve the court's authority and to punish for disobedience of its orders, the contempt is criminal. Where the primary purpose is to provide a remedy for an injured suitor and to coerce compliance with an order the contempt is civil. The same act may constitute both civil and criminal contempt and contempts may be neither wholly civil nor altogether criminal but may partake of characteristics of both. *State ex rel. Arnold v. Conley*, ____ W.Va. ____, 153 S.E.2d 681 (1966). We think this is so in the instant case.

The court was made aware of the disobedience of its order in that custody of the infant was not surrendered to the mother at the time designated. Instead, the father, grandfather and grandmother, absconded, allegedly taking the infant with them. *W.Va. Code*, 1931, 61-5-26(d) provides that the court may punish summarily for "disobedience ... to any lawful process, judgment, decree or order of said court." Pursuant to this, the court directed the issuance of a capias for all three participants. The petitioner, the grandfather of the child, was the only one found. While we believe that the court could have proceeded to try the petitioner for contempt under section (d) above, the court directed that a contempt petition be filed by the mother and served upon the petitioner and the other participants.

Action on the contempt petition being one in civil contempt, summary punishment was not available to the court. A rule to show cause was served on the petitioner and a hearing was set. The matter is yet to be heard so the petitioner's complaint that he has been found guilty and punished for contempt is without merit. The plain purpose of the capias was to prevent further disobedience of the court's lawful order. No appeal of the court's custody order was taken by the father of the child. Subsequent to said order the father, child and the grandparents simply disappeared. It appears that they sought to evade the process of law and take matters into their own hands. It will be determined in the contempt hearing whether such assumption is true.

Relying on *Johnson v. Mississippi*, 403 U.S. 212, 29 L. Ed. 2d 423, 91 S. Ct. 1778 (1971), the petitioner contends that he was entitled to notice or hearing before he was arrested. In *Johnson*, it was held, "If some essential elements of the offense of contempt are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about those essential elements, due process requires that the alleged contemnor be accorded notice and a fair hearing at which he is given the opportunity to show that the

version of the alleged contempt related to the judge was inaccurate, misleading, or incomplete."

The petitioner has been served with notice and a hearing had been set. He seeks to prohibit that hearing on the sole ground that he was apprehended on a capias and required to post bond assuring his appearance at the hearing. The petitioner, without explanation, having evaded the process of the law from July 17, 1977 to November 6, 1977, gave the court no reason to believe that he would appear for hearing at the designated time unless resort was had to apprehension by use of a capias. We believe that the court's action in the circumstances presented here was justified.

In *Ex Parte Kirby*, 100 W.Va. 70, 130 S.E. 86 (1925), the court said: "The history of contempt proceedings shows that the law concedes to judges and courts the inherent right and authority to issue an attachment in the first instance, without an antecedent rule, where the case is urgent or the contempt is flagrant." Reflecting the latitude afforded courts in Point 1, Syllabus of *State of West Virginia v. Frew and Hart*, 24 W.Va. 416 (1884), "Where a contempt is not committed in open court, the usual course is to issue a rule to show cause why an attachment should not issue, though the attachment sometimes issues in the first instance." In further support of the judge's action in the instant case is the expression of the Court in *Kirby, supra:* "The attachment herein is merely *the process* of the court, and serves the same purpose as a warrant or other writ whereby an accused is apprehended and held for trial. The order directing the attachment does not purport to find the petitioners guilty, but extends to them an opportunity to be heard ..." (emphasis in opinion)

The principles expressed in *Kirby, supra* and *Frew and Hart, supra,* are applicable to the case at bar. The capias issued by the respondent did not purport to find the petitioner guilty of contempt but merely provided the means by which he could be held to answer the charges. It is urgent that a trial court, in circumstances such as

presented here, be provided with the means by which it can require enforcement of its lawful orders.

Here the respondent judge believed that he was acting in the best interest of the child, the paramount concern in any consideration of a child's custody. He was given reason to believe that his order was being disobeyed and that the petitioner's action was contrary to the child's best interest. Consequently, the court believed that it was imperative that it act quickly and decisively, both for the protection of the child's welfare and to require obedience of its lawful order. We are of the firm opinion, in the circumstances of this case, that the respondent was fully justified in issuing a capias and imposing a bond assuring the petitioner's appearance at a hearing to determine his guilt or innocence of contempt.

For the foregoing reasons, the writ of prohibition is denied.

*Writ denied.*

MILLER, JUSTICE, *concurring in part and dissenting in part:*

My dissent goes to the majority's sanctioning of the use of an attachment for arrest in this case. I concur in the final result since the trial court ultimately placed the contempt on a correct procedural footing.

I

While the majority correctly states the rule of a non-party's liability for contempt in the first syllabus, I do not believe that on the record in this case there was a sufficient factual showing to warrant the issuance of an arrest attachment.

The majority acknowledges the contemnor, James B. Hendershot, Sr., was not a party to the original divorce action, which was between his son and daughter-in-law. There is nothing in the record before us to show that he had actual knowledge of the order requiring that his son transfer custody of the child to his wife.

There was no petition or affidavit filed with the court setting out any facts on which it could have concluded that the contemnor had actual knowledge of the divorce order transferring custody of the child to the mother, or facts to show that the contemnor was acting in concert with the father to violate the order.

Included within the order transferring custody, which is the order claimed to be violated, is this statement: "The court having learned ... that the grandparents ... have absconded with the child ..." The trial court in the same order authorized that the contemnor be arrested and brought before the court "to hear the court's judgment." This order was entered July 12, 1977.

How the court learned of these facts, we know not. It is not represented that a further hearing was held at which time sworn testimony was given to the court to show that the grandfather had actual notice of the order and was acting in concert with the child's father to prevent the mother from obtaining custody.

A nonparty cannot be charged with contempt of an order even if he has knowledge of it unless he is in legal privity with a party to the order or is acting in concert with a party to violate its terms, as stated in *United States v. IBEW*, 72 F.R.D. 507, 510-11, (E.D. La. 1976):

> "Mere knowledge of the existence of the consent decree is insufficient to establish privity. *Zenith Corp. v. Hazeltine.* [395 U.S. 100, 23 L. Ed. 2d 129, 89 S.Ct. 1562 (1969)] Likewise, the mere doing of the prohibited act is not grounds for contempt. '[I]t is not the act described which the decree may forbid, but only that act when the defendant does it.' *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832, 833 (C.2, 1930). Some degree of active participation with a signatory must be shown in order to establish privity. The mere showing of a common interest is not enough. *Heyman v. Kline*, 444 F.2d 65 (C.2, 1971)."

*See also NLRB v. Sequoia District Council of Carpenters*, 568 F.2d 628 (9th Cir. 1977); *EEOC v. International Longshoremen's Association*, 541 F.2d 1062 (4th Cir.

1976); *State University of New York v. Denton*, 35 A.D.2d 176, 316 N.Y.S.2d 297 (Sup. Ct. 1970); *Ex parte Davis*, 470 S.W.2d 647 (Tex. 1971); *cf. United States v. Hall*, 472 F.2d 261 (5th Cir. 1972).

Judge Learned Hand in *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2nd Cir. 1930), discussed the rationale behind this rule:

> "On the other hand no court can make a decree which will bind any one but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large, no matter how broadly it words its decree. If it assumes to do so, the decree is pro tanto brutum fulmen,[1] and the persons enjoined are free to ignore it.
>
> . . . .
>
> "[I]t is not the act described which the decree may forbid, but only that act when the defendant does it." [42 F.2d at 832-33]

He went on to note two exceptions to the general rule:

> "This means that the respondent must either abet the defendant, or must be legally identified with him." [42 F.2d at 833]

In *Chase National Bank v. City of Norwalk*, 291 U.S. 431, 436-37, 78 L. Ed. 894, 898, 54 S.Ct. 475, (1934), a nonparty's status was discussed:

> "It is true that persons not technically agents or employees may be specifically enjoined from knowingly aiding a defendant in performing a prohibited act if their relation is that of associate or confederate. Since such persons are legally identified with the defendant and privy to his contempt, the provision merely makes explicit as to them that which the law already implies." [citations omitted]

*Chase National* cited *Alemite, supra*, for the proposition that to treat as a contempt the conduct of persons

---

[1] Loosely translated from the Latin "as to that part an empty noise."

not bearing such a relationship is to extend the contempt power against "the conduct of persons who act independently and whose rights have not been adjudged according to law." The Court concluded that: "To subject them to such peril violates established principles of equity jurisdiction and procedure." [291 U.S. at 437, 78 L. Ed. at 898, 54 S.Ct. at 477]

The United States Supreme Court in *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 38 L. Ed. 2d 388, 94 S.Ct. 414 (1973), spoke to the question of privity and re-affirmed its earlier decision in *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 89 L. Ed. 661, 65 S.Ct. 478 (1945), where it held that Rule 65(d) of the Federal Rules of Civil Procedure, concerning the persons subject to an order, essentially followed the common law:

> "Rule 65(d) 'is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in "privity" with them, represented by them or subject to their control.' Regal Knitwear, 324 US, at 14, 89 L. Ed. 661." [414 U.S. at 179, 38 L. Ed. 2d at 400, 94 S.Ct. at 422-23]

While I do not find a case in our jurisdiction directly on this issue, it seems to me that *State ex rel. Finley Bros. v. Freshwater*, 107 W.Va. 210, 148 S.E. 6 (1929), and *State v. Robertson*, 124 W.Va. 648, 22 S.E.2d 287 (1942), are not inconsistent with this law. In *Freshwater*, the Court concluded that a party named in the bill for injunction, although not named in the injunction order, was a person enjoined and therefore could collect damages from a wrongful injunction. Clearly the party had been served and had the opportunity to answer the underlying suit.

*Robertson* involved nonparties who had actual notice of an injunction and proceeded to conspire directly with the named defendants to violate the injunction order which had prohibited the holding of a nominating convention. Obviously their direct participation with the

named parties after knowledge of the injunction brought them within the foregoing rule.

Here, there is nothing in the record to demonstrate that the contemnor actually knew of the existence of the order transferring custody to his daughter-in-law. Likewise, there is absent any factual basis on which the court could have concluded that the contemnor was acting in concert with the defendant to violate the transfer order. Before the court could properly consider whether the issuance of an arrest attachment was warranted, such facts must have been brought to the attention of the court by a verified petition or affidavit.

## II

While the peculiar posture of this case does not require for the actual holding a discussion of the procedure surrounding an arrest attachment, since the final contempt hearing rests on a subsequent properly issued rule to show cause, I nevertheless feel, in view of the lack of any developed statement on the subject, that some standards should be set. In order to do so, a review of the procedural safeguards set in our contempt law is useful to determine how applicable these standards may be to an arrest attachment.

Despite the language in the majority opinion that contempt can be either civil or criminal, it has been a firmly established principle in our law of contempt that the proceeding for its punishment is criminal in character and the rules of evidence governing criminal trials are applicable. *State ex rel. Arnold v. Conley,* 151 W.Va. 584, 587, 153 S.E.2d 681, 683 (1966), makes this plain:

> " 'Whether the proceedings are civil or criminal, a contempt of court is in the nature of a criminal offense, and the proceeding for its punishment is criminal in its character, and the rules of evidence governing criminal trials are applicable. * * *.' 4 M.J. Contempt, Section 3, page 242. To the same effect, see 17 Am.Jur.2d, Contempt, Section 78, page 72; *State ex rel. Alderson v. Cunningham,* 33 W. Va. 607, pt. 1, syl., 11

S.E. 76; *State v. Davis,* 50 W. Va. 100, 40 S.E. 331; *State ex rel. Continental Coal Co. v. Bittner,* 102 W. Va. 677, pt. 2 syl., 136 S.E. 202 [49 A.L.R. 968]; *State ex rel. Taylor v. Devore,* 134 W. Va. 151, pt. 2 syl., 58 S.E.2d 641; *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W. Va. 230, pt. 1 syl., 72 S.E.2d 203; *State ex rel. Taft v. Cox [State ex rel. Cox v. Taft],* 143 W. Va. 106, pt. 2 syl., 100 S.E.2d 161."

Not only do the criminal rules of evidence apply in a contempt proceeding, but as demonstrated by the following language from *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W.Va. 230, 239, 72 S.E.2d 203, 208 (1952), the underlying affidavit or information on which the rule to show cause is issued must contain sufficient facts to constitute an offense:

"In *State [ex rel. Ben Franklin Coal Co.] v. Lewis,* 113 W. Va. 529, 168 S.E. 812, this Court stated: '* * * And, since a prosecution for contempt is in the nature of a prosecution for a crime, such affidavit or information should state the acts constituting the offense with as great certainty as is required in criminal proceedings. *State [ex rel. Continental Coal Co.] v. Bittner,* 102 W. Va. 677, 136 S.E. 202 [49 A.L.R. 968]; *State v. Davis,* 50 W. Va. 100, 40 S.E. 331; *State v. Ralphsynder,* 34 W. Va. 352, 12 S.E. 721, *State [ex rel. Alderson] v. Cunningham,* 33 W. Va. 607, 11 S.E. 76.' In *State [ex rel. Mineral State Coal Co.] v. Komar,* 113 W. Va. 526, 168 S.E. 810, this Court held: 'To support an adjudication of contempt the information or affidavit, upon which the rule is issued, must show on its face facts sufficient to constitute the offense.' See *State v. Gibson,* 33 W. Va. 97, 10 S.E. 58; 17 C.J.S., Contempt, Section 72."

Obviously, these salutary safeguards have been infused into our contempt law on the basic premise that liberty and property are at stake in a contempt proceeding by reason of the court's power to fine and jail. *See Smoot v. Dingess,* ____ W. Va. ____, 236 S.E.2d 468, 473 (1977) (concurring opinion). These protections arise from

the Due Process Clause of our State and Federal Constitutions.

In *Cooke v. United States*, 267 U.S. 517, 537, 69 L. Ed. 767, 774, 45 S.Ct. 390, 395 (1925), the Court clearly linked the Due Process Clause to a contempt proceeding, stating:

> "Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised on the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed. See *Hollingsworth v. Duane*, [Wall. Sr. 77, Fed. Cas. No. 6,616] 12 Fed. Cases 359, 360; *In re Stewart*, 118 La. 827 [43 So. 455]; *Ex parte Clark*, 208 Mo. 121 [15 L.R.A. (N.S.) 389, 106 S.W. 990]."

While *Cooke* dealt with contempt in a federal district court, there is no doubt that its concept of due process in contempt procedures has been made binding on the states. *Groppi v. Leslie*, 404 U.S. 496, 30 L. Ed. 2d 632, 92 S.Ct. 582 (1972); *Johnson v. Mississippi*, 403 U.S. 212, 29 L. Ed. 2d 423, 91 S.Ct. 1778 (1971); *In re Oliver*, 333 U.S. 257, 92 L. Ed. 682, 68 S.Ct. 499 (1948).

In *Bloom v. Illinois*, 391 U.S. 194, 20 L. Ed. 2d 522, 88 S.Ct. 1477 (1968), the United States Supreme Court made an extensive analysis of the common law background of contempt. In the course of review, it made this statement:

> "The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt—it is an 'arbitrary' power which is 'liable to abuse.' *Ex parte Terry*, 128 U.S. 289, 313 [32 L. Ed. 405, 412, 9 S.Ct. 77, 83 (1888)]. '[I]ts exercise is a delicate one, and care is needed to avoid arbitrary or oppressive conclu-

sions.' *Cooke v. United States*, 267 U.S. 517, 539, 69 L. Ed. 767, 775, 45 S. Ct. 390, [396] (1925)." [39] U.S. at 202, 20 L. Ed. 2d at 529, 88 S.Ct. at 1482]

The Court in *Bloom* also spoke of a parallel apprehension in Congress over the "open-ended authority to deal with contempt," lodged by the common law in the courts, which had resulted in substantial abuses:

> "The result was drastic curtailment of the contempt power in the Act of 1831, 4 Stat 487. ... [citations omitted] That Act limited the contempt power to misbehavior in the presence of the court or so near thereto as to obstruct justice; misbehavior of court officers in their official transactions; and disobedience of or resistance to the lawful writ, process, order or decree of the court." [391 U.S. at 203, 20 L. Ed. 2d at 529, 88 S.Ct. at 1483]

A similar parallelism can be found in this State by the Legislature's enactment of W.Va. Code, 61-5-26.[2] This provision was taken from Virginia, where it appeared in almost identical form in Chapter 195, Sections 24-26, of the 1849 Code of Virginia, having originally been en-

---

[2] "The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: (a) Misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice; (b) violence or threats of violence to a judge or officer of the court, or to a juror, witness, or party going to, attending or returning from the court, for or in respect of any act or proceeding had, or to be had, in such court; (c) misbehavior of an officer of the court, in his official character; (d) disobedience to or resistance of any officer of the court, juror, witness, or other person, to any lawful process, judgment, decree or order of the said court. No court shall, without a jury, for any such contempt as is mentioned in subdivision (a) of this section, impose a fine exceeding fifty dollars, or imprison more than ten days. But in any such case the court may impanel a jury (without an indictment or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict. No court shall impose a fine for contempt, unless the defendant be present in court, or shall have been served with a rule of the court to show cause, on some certain day, and shall have failed to appear and show cause."

acted in the 1830-31 Session of the General Assembly as Chapter 11, Section 25, of the 1831 Acts of Virginia.

This Court, in *Hallam v. Alpha Coal Corp.*, 122 W.Va. 454, 459, 9 S.E.2d 818, 821 (1940), spoke on the scope of this section, stating:

> "[This] section which, by its language, conferred upon the courts jurisdiction to punish summarily the listed instances of contempt, including misbehavior of an officer of the court in his official character, ... expressly excludes proceeding summarily in all other cases."

Earlier, in *State ex rel. McNinch v. Porter*, 105 W.Va. 441, 143 S.E. 93 (1928), and *State v. McClaugherty*, 33 W. Va. 250, 10 S.E. 407 (1889), the Court held that this statute was not an unconstitutional restraint on the inherent judicial power of a court to punish for contempt.[3]

It is important to realize that W.Va. Code, 61-5-26, is a limitation only on the court's power to deal summarily with contempt; that is, to act without a jury and without indictment. *McNinch*, in speaking of the statute on this point, stated:

> "Section 27, of chapter 147, has been held constitutional. *State v. McClaugherty*, 33 W. Va. 250 [10 S.E. 407]. It is there said that the statute is simply a regulation of the proceedings and not a limitation upon the jurisdiction of the courts in contempt cases; and that under section 30, the courts have 'an efficient means of punishment. They have the right at any time to call before them both grand and petit juries, and under the statute they may with but little delay—almost as summarily as before the statute—punish such contempts. The statute as to such courts may well be regarded as a regulation, and, perhaps, a

---

[3] The Virginia court in *Carter v. Commonwealth*, 96 Va. 791, 32 S.E. 780 (1899), declared the portion of its statute, which had been amended in the 1897-98 session of its General Assembly to provide a jury trial in all cases of indirect contempt, to be unconstitutional.

necessary and proper limitation.' " [105 W.Va. at 445-46, 143 S.E. at 94-95]

It is also critical to any understanding of our law of contempt to realize that while W.Va. Code, 61-5-26, designates the categories where a court may act summarily in the prosecution of a contempt, this does not mean that in these instances there are no procedural safeguards. This Court in *Ex parte Mylius*, 61 W.Va. 405, 56 S.E. 602 (1907), in discussing a contempt for failure to pay alimony, set the following law in its syllabus:

"A rule to show cause why a person shall not be adjudged guilty of contempt must be served in person on the party charged."

"A judgment or order committing to jail upon a charge of contempt in disobeying a decree, made in the absence of the person, is void, and a person imprisoned under it will be relieved by a writ of *habeas corpus*."

The use of the word "summarily" in connection with a contempt proceeding has historically meant the right of the court to entertain a contempt proceeding without the necessity of indictment or the right to a jury trial.[4] Certainly *Mylius* emphasizes the requirement of notice of the contempt charge and a right to be heard. "Mylius

---

[4] The historical background of the summary procedure is traced in R. Goldfarb, *The Contempt Power*, at 9-19 (1963), and in Fox, *The Summary Process to Punish Contempt*, Pt. 1, 25 L.Q. Rev. 238 (1909). Goldfarb concludes that much of the extension of the summary power of punishment for contempt rests on *The King v. Almon* (1765), an undelivered opinion that has been shown to contain a number of historical inaccuracies. *See* Fox, *The King v. Almon*, 24 L.Q. Rev. 184 (1908).

Sir John Fox demonstrates not only in the foregoing articles but in a later article, *The Writ of Attachment*, 40 L.Q. Rev. 43 (1924), that the precedential basis for summary proceedings for contempt out of the presence of the court and attachment of the person is extremely meager at common law. *Bloom v. Illinois*, 391 U.S. at 198 n. 2, 20 L. Ed. 2d at 527, 88 S.Ct. at 1480-81, noted the inadequacy of common law precedent, but recognized that most courts in this country have sanctioned the use of summary proceedings in contempt, whether committed within or outside the presence of the court, on the theory that it was sanctioned at common law.

had right to a hearing, to a day in court, to purge himself of contempt before being sent to prison." [61 W.Va. at 407, 56 S.E. at 603] This comports with the standard set in *Cooke,* which has been previously quoted.

Despite some statements to the contrary,[5] this Court has with considerable fidelity viewed a contempt proceeding, regardless of whether it might be labeled civil or criminal from a substantive standpoint, to be from a procedural viewpoint quasi-criminal in nature. *State ex rel. Arnold v. Conley, supra,* and cases cited therein.

There is much merit to this approach, as it avoids what most commentators regard as a difficult pursuit of trying to determine in advance by some standard whether the contempt proceeding is civil or criminal.[6]

While W.Va. Code, 61-5-26, has been regarded as a limitation on the power of a court to punish summarily for contempt, I do not completely share this view. If the statute is weighed against the common law right, which appears to have been limited to contempts in the presence of the court, the statute provides a broader right to punish summarily.[7]

The statute does set a limitation on the *amount* of punishment that may be meted out in one instance. Under W.Va. Code, 61-5-26(a), which relates to misbehavior in the presence of the court, "a fine exceeding fifty dollars, or imprisonment more than ten days" may not be imposed without empaneling a jury.

Of course, even in this area of direct contempt in front of the court, it has been recognized that there are certain elemental due process procedures that must be afforded. In *Taylor v. Haynes,* 418 U.S. 488, 41 L. Ed. 2d 897, 94 S.Ct. 2697 (1974), the United States Supreme

---

[5] *Smith v. Smith,* 81 W.Va. 761, 95 S.E. 199 (1918).

[6] *See, e.g.,* Goldfarb, *The Contempt Power, supra* at 49-67; J. Oswald, *Contempt of Court,* at 1-18 (Robertson ed. 1910); Dobbs, *Contempt of Court: A Survey,* 56 Cornell L. Rev. 183 (1971); *Johansen v. State,* 491 P.2d 759, 762-67 (Alaska 1971).

[7] *See* n. 4.

Court held that while the trial judge has the power "for the purpose of maintaining order in the courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him" [418 U.S. at 497, 41 L. Ed. 2d at 907, 94 S.Ct. at 2702-703], if he elects not to exercise that power at the time the contempt occurs, then the court should provide "reasonable notice of the specific charges and opportunity to be heard in his own behalf." [418 U.S. at 499, 41 L. Ed. 2d at 908, 94 S.Ct. at 2703]

*Bloom* provides another due process standard by requiring a jury trial in serious criminal contempts where imprisonment exceeds six months. It keyed this constitutional right to a contemporaneous holding in *Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S.Ct. 1444 (1968), which required the states to provide a jury in all criminal trials except those involving petty offenses.

This Court, in *Eastern Associated Coal Corp. v. Doe,* ___ W.Va. ___, 220 S.E.2d 672 (1975), discussed some aspects of contempt and required the appointment of counsel where the contemnor is indigent. In that case, the Court found that the contempt proceeding, which involved the violation of an injunction order that resulted in a maximum punishment of a $500 fine and six months' imprisonment, was a criminal contempt proceeding.[8]

*Eastern Association Coal Corp.* was followed by *Smoot v. Dingess,* ___ W. Va. ___, 236 S.E.2d 468 (1977), where this Court stated:

___

[8] *Eastern Associated Coal Corp.* did not discuss contempt in light of W.Va. Code, 61-5-26, nor did it cite or consider the ramifications of *Bloom v. Illinois.* The question is therefore open as to whether, under Article III, Section 14, of the West Virginia Constitution, which requires "trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men ..." sets a higher standard for a jury trial in criminal contempt than that imposed federally by *Bloom,* except as to those contempts directly occurring before the court which the common law recognized were within the court's summary province. This issue is not before us in the present case.

"Regardless of whether a contempt proceeding is civil or criminal, a defendant has the right to be represented by counsel, and if he is indigent counsel must be appointed to represent him." [236 S.E.2d at 471]

In summary, I believe our contempt law requires that, regardless of whether the contempt is labeled civil or criminal, the following procedural safeguards are mandated by the Due Process Clause, Article III, Section 10, of the West Virginia Constitution: first, an adequate notice of the contempt charge and a reasonable opportunity to be heard, *State ex rel. Hoosier Engineering Co. v. Thornton*, 137 W.Va. 230, 72 S.E.2d 203 (1952); *Ex parte Mylius*, 61 W.Va. 405, 56 S.E. 602 (1907); second, the assistance of retained counsel, or, in the case of indigency, of appointed counsel; and third, a record of the proceedings, *Smoot v. Dingess, supra;* and fourth, application of the criminal rules of evidence, *State ex rel. Arnold v. Conley*, 151 W.Va. 584, 153 S.E.2d 681 (1966). The one exception to these procedures is that, where the contempt is committed in the presence of the court and observed by it and the court elects to punish the contempt immediately, it may do so. *Taylor v. Hayes, supra.*

It is within this broader perspective of the procedural safeguards in our contempt law that the proceedings for an arrest attachment must be viewed. While it is true that an attachment for the arrest of the person for a contempt was recognized at common law, it was sparingly used and may only have been available where the alleged contemnor did not respond to the rule to show cause.[9] Even though the practice has obtained in this country, it appears to have received little in the way of analysis.[10] The United States Supreme Court expressed its aversion to the practice of *Cooke v. United States*, 267

[9] Fox, *The Writ of Attachment*, 40 L.Q. Rev. 43 (1924).

[10] *See, e.g., Planning and Zoning Commission v. Zemel Bros.*, 29 Conn. Supp. 450, 292 A.2d 267 (1971); *Robinson v. State*, 42 Ala. App. 489, 168 So.2d 491 (1964); *Croucher v. Croucher*, 51 Ill. App. 2d 17, 200 N.E.2d 854 (1964).

U.S. 517, 69 L. Ed. 767, 45 S.Ct. 390 (1925), when it stated:

> "It is not shown that the writ of attachment contained a copy of the order of the court, and we are not advised that the petitioner had an exact idea of the purport of the charges until the order was read. In such a case, and after so long a delay, it would seem to have been proper practice, as laid down by Blackstone, 4 Commentaries, 286, to issue a rule to show cause. The rule should have contained enough to inform the defendant of the nature of the contempt charged. See *Hollingsworth v. Duane,* [Wall. Sr. 141, Fed. Cas. No. 6,717] 12 Fed. Cases 367, 369. Without any ground shown for supposing that a rule would not have brought in the alleged contemnors, it was harsh under the circumstances to order the arrest." [267 U.S. at 537, 69 L. Ed. at 774, 45 S.Ct. at 395]

Laying aside the historical antecedents of an attachment of the person, clearly the process amounts to nothing more than the arrest of the person. I find it difficult to reconcile this extraordinary measure, unattended as it seems to be by procedural safeguards, with any modern concept of procedural due process.

Because of the harshness of the arrest attachment procedure, I think it is important that it be surrounded by certain procedural safeguards. To my mind it is rather anomalous, to say the least, that we recognize that a person's property cannot be seized without notice and a hearing, absent some extraordinary state interest, *Anderson v. George,* ____ W.Va. ____, 233 S.E.2d 407 (1977); *State ex rel. Payne v. Walden,* 156 W.Va. 60, 190 S.E.2d 770 (1972), and yet accord no due process procedures governing the issuance of an arrest attachment.

In the first place, there is nothing in the record before us to demonstrate on what factual basis the court initially decided that it was probable that the contemnor had in fact violated the court's order. The alleged failure to turn over the child was not an act which occurred in

the presence of the court. In order to obtain even a rule to show cause for contempt, an affidavit or information must be filed to show the facts which constitute the contempt. *State ex rel. Hoosier Engineering Co. v. Thornton, supra.*

Since an attachment of the person is nothing more than an arrest, I would by analogy impose the requirements of our criminal procedure relating to an arrest. The complaint should either be verified or the written statement sworn to before the court. It must contain sufficient facts to support a finding of probable cause that an act of contempt has occurred. W.Va. Code, 62-1-1 and -2.[11]

Furthermore, the issue of probable cause is not settled by the court's finding that it is likely that the contemnor committed the contempt. If he is a nonparty it must be shown that he had actual knowledge of the underlying order and was either in legal privity with a party or acted in concert with a party to violate the order.[12] Finally, the facts must demonstrate some urgent and compelling reason for the issuance of the arrest attachment in lieu of the normal rule to show cause.

In this connection *Ex parte Kirby,* 100 W.Va. 70, 130 S.E. 86 (1925), cited by the majority, authorized the use of an arrest attachment where a previous rule to show cause had been issued and before the hearing similar acts of contempt were repeated. *Kirby's* reliance on *Rex v. Earl Ferrers,* 1 Burr. 631, 97 Eng. Rep. 483 (K.B. 1758),

---

[11] W.Va. Code, 62-1-1:

"The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a justice of the peace."

W.Va. Code, 62-1-2:

"If it appears from the complaint that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to arrest persons charged with offenses against the State. More than one warrant may issue on the same complaint."

[12] *See* cases cited at pp. 2-4.

for the proposition that an attachment could issue in the first instance, is misplaced. A reading of that case demonstrates that the arrest attachment issued only after the Earl had refused to respond to several rules to show cause and had detained and threatened the process server.[13]

I do not say there are no instances where a court would be warranted in issuing an attachment for arrest in the first instance, but the facts must be compelling. Here, there is a lack of any facts in the record to justify a finding that the circumstances were compelling.

Another defect in the initial proceeding is that the warrant of attachment served on the contemnor did not give any notice of the facts which constituted the alleged contempt. Again, we have required, in Syllabus 2 of *State ex. rel. Hoosier Engineering Co. v. Thornton, supra,* where the contempt was proceeded upon by a rule to show cause, that:

> "In a prosecution for contempt of court for an alleged violation of an injunction decree, not committed in the presence of the court, the defendant is entitled to be fully and plainly informed of the character and cause of the accusation."

A parallel requirement of notice is obviously required in an arrest attachment. I would continue to apply by analogy the requirements of our criminal procedure. *See* W.Va. Code, 62-1-3.[14]

---

[13] The Pennsylvania case of *Thomas v. Cummins,* 1 Yeates 1 (1791), relied on by *Kirby,* is clearly not the law in Pennsylvania today. *See Commonwealth ex rel. Magaziner v. Magaziner,* 434 Pa. 1, 253 A.2d 263 (1969). The only other case cited by *Kirby* to authorize the issuance of an attachment in the first instance is *Petrie v. People,* 40 Ill. 334 (1866), but this must be read in light of *People v. Sherwin,* 353 Ill. 525, 187 N.E. 441 (1933), where the court required in indirect contempts notice of the charge and an opportunity to be heard.

[14] "The warrant shall be signed by the justice and shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certain-

A further procedural safeguard required in an arrest attachment is that the alleged contemnor must be brought before the court without unnecessary delay. This follows the normal arrest procedure under W.Va. Code, 62-1-5.[15]

Certainly, *Smoot v. Dingess*, ___ W.Va. ___, 236 S.E.2d 468 (1977), requires the appointment of counsel in case of indigency, as does W.Va. Code, 62-1-6, in the ordinary criminal case.[16] The right to reasonable bail is constitutional. West Virginia Constitution, Article III, Section 5.

Moreover, because of the extraordinary nature of the arrest-by-attachment procedure, the court should view bail liberally since a substantive criminal offense is not

---

ty. It shall describe the offense charged in the complaint. It shall command that the defendant be arrested and brought before a justice of the county in which the warrant is executed."

Obviously, the attachment must from a mechanical standpoint issue from the clerk's office, since it is the circuit court which has authorized the arrest attachment.

[15] W.Va. Code, 62-1-5:

"An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice of the county in which the arrest is made. When a person arrested without a warrant is brought before a justice, a complaint shall be filed and a warrant issued forthwith. The officer executing the warrant shall make return thereof to the justice before whom the defendant is brought."

[16] W.Va. Code, 62-1-6:

"The justice shall in plain terms inform the defendant of the nature of the complaint against him, of his right to counsel and, if the offense is to be presented for indictment, of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. He shall provide the defendant reasonable means to communicate with an attorney or with at least one relative or other person for the purpose of obtaining counsel or arranging bail. The defendant shall not be committed to jail or removed from the county of arrest until he has had a reasonable opportunity to confer with counsel or to arrange bail. He may be detained under such security measures as the circumstances warrant. If the defendant is unable to provide bail or if the offense is unbailable, he shall be committed to jail."

involved.[17] Should the contemnor not be able to make bail, the court must then schedule a full hearing on the contempt as soon as practicable. The denial of a prompt hearing on the underlying contempt charge is particularly offensive to concepts of due process where the contemnor remains in jail.[18]

In the present case the trial court acted promptly to set bail on November 7, 1977, after the arrest on November 6. Had the alleged contemnor not been able to post bond, the trial court's setting of the hearing on December 15, 1977, on the underlying contempt charge would not have been sufficiently prompt.

### III

I concur with the majority in the ultimate disposition of the case by a discharge of the writ of prohibition. The invalidity of the arrest attachment was cured when a proper petition for a rule to show cause was filed and served on the alleged contemnor and the matter set for hearing. At this point, the trial court was no longer acting in excess of its jurisdiction and prohibition would not therefore lie.

I am authorized to state that Justice Harshbarger joins in Parts II and III, the concurring portions of this opinion, and Justice McGraw joins with me in all portions of this opinion.

---

[17] Absent some extraordinary circumstances, which are not reflected in the record in this case, a $20,000 bail is unreasonable in this type of case. *State ex rel. Hutzler v. Dostert*, ____ W.Va. ____, 236 S.E.2d 336 (1977).

[18] To the extent that *Ex parte Kirby*, 100 W.Va. 70, 130 S.E. 86 (1925), suggests that a contemnor arrested under an attachment has no right to a prompt hearing, I would overrule the case. *Kirby* seemingly overlooks the basic fact that the purpose of the hearing is to determine if the contemnor is guilty of the contempt. Moreover, the critical point is that the alleged contempt is not a substantive criminal offense and the use of an arrest attachment is therefore an extraordinary procedure.