# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

### September 2021 Term

_____

### No. 21-0036

_____

**FILED**
**November 15, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
**Defendant Below, Petitioner**

v.

### AMERISOURCEBERGEN DRUG CORPORATION, and BELLCO DRUG CORPORATION,
**Plaintiffs Below, Respondents**

v.

### ACE AMERICAN INSURANCE COMPANY and ACE PROPERTY AND CASUALTY INSURANCE COMPANY,
**Defendants Below, Intervenor-Petitioners**

_____

**Appeal from the Circuit Court of Boone County**
**The Honorable William S. Thompson, Judge**
**Civil Action No. CC-03-2017-C-36**

**AFFIRMED, IN PART, REVERSED, IN PART,**
**AND REMANDED**

_____

**Submitted: September 29, 2021**
**Filed: November 15, 2021**

Thomas E. Scarr, Esq.
Lee Murray Hall, Esq.,
Sarah A. Walling, Esq.
Jenkins Fenstermaker, PLLC
Huntington, West Virginia
Andrew T. Frankel, Esq., *Pro Hac Vice*

Charles S. Piccirillo, Esq.
Todd A. Mount, Esq.
Shaffer & Shaffer PLLC
Madison, West Virginia
Courtney C.T. Horrigan, Esq.,
*Pro Hac Vice*

**Bryce L. Friedman, Esq.,** *Pro Hac Vice*
**Matthew C. Penny, Esq.,** *Pro Hac Vice*
**Simpson Thacher & Bartlett LLP**
**New York, New York**
**Counsel for the Petitioner**
**St. Paul Fire and Marine Insurance**
**Company**

**J. Zak Ritchie, Esq.**
**Hissam Forman Donovan Ritchie**
**PLLC**
**Charleston, West Virginia**
**Counsel for the Intervenor-Petitioners**
**Ace American Insurance Company and**
**Ace Property and Casualty Insurance**
**Company**

**Kim M. Watterson, Esq.,** *Pro Hac Vice*
**Reed Smith LLP**
**Pittsburgh, Pennsylvania**
**Counsel for the Respondents**
**AmerisourceBergen Drug Corporation**
**and Bellco Drug Corporation**

**JUSTICE HUTCHISON delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.      "*West Virginia Constitution*, article VIII, section 3, which grants this Court appellate jurisdiction of civil cases in equity, includes a grant of jurisdiction to hear appeals from interlocutory orders by circuit courts relating to preliminary and temporary injunctive relief."  Syl. pt. 2, *State ex rel. McGraw v. Telecheck Servs., Inc*., 213 W. Va. 438, 582 S.E.2d 885 (2003).

2.      "The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ."  Syl. pt. 4, *State v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932).

3.      "In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review.  We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp*., 168 W.Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo.  Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178,

i

469 S.E.2d 114 (1996)." Syl. pt. 1, *State By & Through McGraw v. Imperial Mktg*., 196 W. Va. 346, 472 S.E.2d 792 (1996).

4. "When the jurisdiction of a court is asserted over a cause of action, it embraces everything in the case and every question arising which can be determined in it; and, until thus exhausted, or in some way relinquished, the jurisdiction is exclusive and cannot be encroached upon by any other tribunal." Syl. pt. 1, *State v. Fredlock*, 52 W. Va. 232, 43 S.E. 153 (1903).

5. "A court having jurisdiction *in personam*, may require the defendant to do, or refrain from doing, beyond its territorial jurisdiction, anything which it has power to require him to do or omit within the limits of its territory." Syl. pt. 2, *State v. Fredlock*, 52 W. Va. 232, 43 S.E. 153 (1903).

6. An anti-suit injunction is an order barring parties to an action in this state from instituting or prosecuting substantially similar litigation in another state. Whether the foreign state action is substantially similar involves assessing (1) the similarity of the parties; (2) the similarity of the issues; and (3) the capacity of the action in this state to dispose of the foreign state action.

7. The principle of comity requires that a circuit court enter an anti-suit injunction cautiously and with restraint.

8.    An anti-suit injunction is an exceptional remedy but is appropriate when equity compels the circuit court: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of an important public policy; (3) to prevent a multiplicity of suits that result in delay, inconvenience, expense, inconsistency, or will be a "race to judgment"; or (4) to protect a party from vexatious, inequitable or harassing litigation.

**HUTCHISON, Justice**:

Over the last two decades, the United States has experienced an epidemic of overdose deaths involving prescription and illicit opioid medications. Governments, businesses and individuals have sued the pharmaceutical distributors that sold prescription opioid medicines and "seek to recover billions in governmental and economic costs allegedly incurred in providing a wide array of public services in response to the influx of opioids into their communities such as increased expenses for first responders, autopsies, morgues, drug rehabilitation, foster care, and drug-related criminal activity."[1] In response, the pharmaceutical distributors have filed suits against their liability insurers seeking to recover, from the insurance policies they purchased over the years, their defense expenses as well as indemnification for settlements.

In this appeal from the Circuit Court of Boone County, we consider the powers of a circuit court to manage a lawsuit by a pharmaceutical distributor against the insurance companies which provided it with liability insurance. Specifically, the circuit court entered an "anti-suit injunction" prohibiting the insurance companies sued in West Virginia from pursuing parallel litigation against the distributor in California. As set forth below, we affirm the circuit court's power to enter an order precluding a party to a West Virginia lawsuit from instituting or prosecuting collateral litigation in a sister state.

---

[1] *Rite Aid Corp. v. ACE Am. Ins. Co.*, 2020 WL 5640817, at *2 (Del. Super. Ct., Sept. 22, 2020).

1

However, because an anti-suit injunction must be narrowly tailored to protect the court's authority while respecting the sister state court, we reverse the circuit court's injunction order and remand the case to permit the circuit court to reconsider the breadth of its order.

## I. Factual and Procedural Background

Plaintiff AmerisourceBergen Drug Corporation ("ABDC") is a wholesale distributor of prescription opioid medication in West Virginia and across the United States.[2] In 2012, the West Virginia Attorney General filed a lawsuit seeking to hold ABDC liable for the prescription opioid epidemic in West Virginia. After the Attorney General reached settlements in the suit in late 2016, a host of state agencies, counties, cities, hospitals, individuals, and others named ABDC as a defendant in as many as 165 similar prescription opioid lawsuits in West Virginia courts. *See generally*, *State ex rel. AmerisourceBergen Drug Corp. v. Moats*, 859 S.E.2d 374, 378 (W. Va. 2021) (discussing the more than eighty opioid lawsuits pending before the West Virginia Mass Litigation Panel). Nationwide, thousands of comparable lawsuits are pending in state and federal courts.

The instant case derives from ABDC's efforts to establish that these prescription opioid lawsuits, nationwide and in West Virginia, are covered under primary,

---

[2] Plaintiff Bellco Drug Corporation also distributes pharmaceutical opioids. Bellco has been a subsidiary of ABDC since October 2007, and it conducts all of its operations through ABDC. We therefore refer to both plaintiffs jointly as "ABDC."

2

umbrella, and excess commercial general liability policies purchased by ABDC (or its predecessors or affiliates). On March 17, 2017, ABDC filed a complaint in the Circuit Court of Boone County, West Virginia, against five insurance companies seeking to establish coverage under sixteen policies issued between 2006 and 2013.[3] ABDC subsequently amended its complaint to refine its claims. The complaints generally alleged that the West Virginia opioid lawsuits raised claims within the scope of policy coverage but that the insurance companies had breached the sixteen insurance contracts when they refused to provide defense costs or liability coverage to ABDC.[4]

---

[3] The circuit court case is styled *AmerisourceBergen Drug Corporation v. Ace American Insurance Company*, Civil Action No. 17-C-36.

[4] The record reflects that the defendant insurance companies refused to provide coverage or a defense because ABDC was sued, not by people who had consumed opioid medications, but by government agencies. ABDC could not identify by name any specific person for whom the government agency had incurred losses in connection with a bodily injury, physical harm, sickness or disease, and also could not identify each person's particular bodily injury. Hence, the insurance companies argued ABDC had failed to allege the occurrence of a "bodily injury" sufficient to trigger indemnification or a defense.

Significantly, the record also reflects that the Attorney General's 2012 lawsuit included as a defendant another pharmaceutical distributor, H.D. Smith, L.L.C., which thereafter sought indemnification and a defense to the Attorney General's suit from its liability insurer. However, the insurer refused coverage for reasons similar to those given to ABDC, prompting a lawsuit by H.D. Smith. On July 19, 2016, the United States Court of Appeals for the Seventh Circuit ruled against the insurer and found no policy requirement that H.D. Smith identify the people harmed or their specific injuries in order to obtain coverage. The court ruled that because the Attorney General's lawsuit alleged losses to government agencies "because of" or "resulting from" bodily injuries, despite those injuries occurring to unknown citizens, the pharmaceutical company was entitled to a defense under the insurance policy. *See Cincinnati Ins. Co. v. H.D. Smith, L.L.C.*, 829 F.3d 771, 774 (7th Cir. 2016). Nine days after the Seventh Circuit's decision, on July 28, 2016, ABDC made demands for indemnification and defense upon the defendant insurers,

Continued . . .

3

ABDC's insurance coverage lawsuit specifically sought a declaratory judgment from the circuit court construing primary, umbrella and excess comprehensive general liability policies issued by defendant St. Paul Fire & Marine Insurance Company ("St. Paul") and by defendants Ace American Insurance Company and Ace Property and Casualty Insurance Company ("Ace American").[5] ABDC requested an order requiring the defendants "to pay for the past, present and future defense costs and liability in connection with prescription opioid lawsuits filed against [ABDC] in this state[.]"

Over the next three-and-a-half years, ABDC and the insurer-defendants participated in extensive discovery. At one point, ABDC produced over ten million pages of documents in response to requests made by the insurer-defendants (because the defendants had sought all documents ever produced by ABDC in all federal and state prescription opioid lawsuits nationwide). After the resolution of numerous discovery disputes by the circuit court, defendant St. Paul filed a motion for summary judgment

demands that formed the basis for the instant case. *See also*, *Giant Eagle, Inc. v. Am. Guarantee & Liab. Ins. Co.,* 499 F. Supp. 3d 147 (W.D. Pa. 2020) (opioid lawsuit by county alleged bodily injuries sufficient to trigger duty to defend); *Cincinnati Ins. Co. v. H.D. Smith Wholesale Drug Co.*, 410 F. Supp. 3d 920 (C.D. Ill. 2019) (finding insurer had a duty to indemnify pharmaceutical distributor for the entire amount of its settlement with the State of West Virginia); *Acuity v. Masters Pharm., Inc.*, 2020 WL 3446652 (Ohio App. 2020) (finding insurer had duty to defend opioid distributor in lawsuits); *Rite Aid Corp. v. ACE Am. Ins. Co*., 2020 WL 5640817 (Del. Super. Ct. Sept. 22, 2020) (same); *Cincinnati Ins. Co. v. Discount Drug Mart, Inc*., 2020 WL 6706791, at *10 (Ohio Com. Pl., Sep. 09, 2020) (same).

[5] ABDC's complaint also named as defendants American Guarantee & Liability Insurance Company and Endurance American Insurance Company.

contending that, as a matter of law, the West Virginia opioid lawsuits did not properly allege damages arising from a "bodily injury" covered by a St. Paul policy. The parties briefed the motion. In early 2020, the circuit court heard argument on St. Paul's summary judgment motion but requested further briefing. Moreover, in an order dated September 28, 2020, the circuit court resolved the last outstanding discovery dispute between the parties.

Then, on November 5, 2020, St. Paul filed a competing insurance coverage action in California state court against ABDC and its corporate subsidiaries and affiliates.[6] In the California complaint, St. Paul alleged that ABDC has been "named in more than 80 lawsuits originally filed in California state and federal court *and hundreds more in other states seeking to hold them responsible for contributing to the opioid crisis in the United States* (the 'Opioid Lawsuits')." (Emphasis added.) St. Paul noted that while several opioid lawsuits nationwide had settled, even after those settlements are concluded,

> there will be hundreds of pending Opioid Lawsuits brought by individuals, companies or governmental entities seeking to hold [ABDC and its affiliates] liable for their role in the opioid crisis, and for which [ABDC and its affiliates] have sought

---

[6] *See* Complaint, *St. Paul Fire and Marine Ins. Co., et al. v. AmerisourceBergen Corporation, et al.*, No. 30-2020-01168930-CU-IC-CXC (Super. Ct. of Orange Cty, Cal., Nov. 5, 2020). The California complaint recites that, in 2001, AmeriSource Health Corporation merged with Bergen Brunswig Corporation (then based in Orange County, California) to form AmerisourceBergen Corporation. The California complaint thereafter refers to ABDC and its various subsidiaries and affiliates as the "Bergen Brunswig Affiliates," despite Bergen Brunswig ceasing to exist as an independent corporate entity in 2001. For the sake of clarity, we continue to refer to mentions of AmerisourceBergen in the California complaint as "ABDC."

5

insurance coverage from the St. Paul Insurers . . . among others ('Remaining Suits').

St. Paul's California complaint alleged that St. Paul issued various insurance policies to ABDC, but sought a declaratory judgment that St. Paul had no duty to defend or indemnify ABDC in any opioid lawsuit filed against ABDC nationwide. Alternatively, St. Paul's complaint named as defendants seventy insurance companies (including companies such as ACE American) "who, on information and belief, issued insurance policies to [ABDC] Affiliates covering periods between 1995 and 2018[.]" The complaint asked the California court to issue a declaratory judgment that, if St. Paul had some obligation to provide coverage for any opioid lawsuit, established the scope and amount of coverage required to be provided by each insurance company to ABDC.

On November 19, 2020, ABDC filed a motion with the West Virginia circuit court seeking an "anti-suit injunction." At the beginning of its motion, ABDC sought injunctive relief solely against St. Paul, asking the circuit court to enjoin St. Paul "from pursuing collateral declaratory judgment litigation in California or elsewhere against ABDC regarding the disputes currently pending" before the West Virginia court. However, ABDC's final request for relief was substantially broader. At the end of its motion, ABDC asked the circuit court to "enjoin St. Paul, *and all other parties to this lawsuit*" from proceeding with the California lawsuit or from "instituting any further collateral lawsuits regarding the issues pending" before the circuit court. (Emphasis added.)

St. Paul contended that no injunction was necessary because the California complaint exempted the West Virginia lawsuit. St. Paul cited to footnote 11 on page 17 of its California complaint which reads:

> In 2017, [ABDC] settled an opioid-related lawsuit brought against it by the Attorney General of West Virginia. Coverage for that settlement and cases brought by certain West Virginia governmental entities against [ABDC] and its affiliates is the subject of litigation pending in West Virginia, styled *AmerisourceBergen Drug Corp., et al. v. ACE American Insurance Co., et al.*, No. 17-C-36 (W. V. Cir. Ct., Boone Cty.), and is not intended to be the subject of this action.

In response to St. Paul's footnote, ABDC argued that the broad language of the California complaint necessarily subsumed and addressed the coverage questions pending in West Virginia. Further, ABDC argued that the California footnote did not say St. Paul carved out the West Virginia cases, rather, it said St. Paul "intended to" carve them out of the California action.

In the interim, the circuit court made progress toward resolving the West Virginia insurance coverage lawsuit. On November 23, 2020, after months of supplemental briefing, the circuit court entered an order denying St. Paul's motion for summary judgment. The circuit court ruled in favor of ABDC and found that "insurance coverage is available under the general liability insurance coverage section of the St. Paul Policy for lawsuits by government entities seeking damages for injuries suffered by their citizens."

7

In an order dated January 7, 2021, the circuit court granted ABDC's motion for an anti-suit injunction and prevented all of the parties from pursuing collateral insurance litigation involving ABDC, in California or elsewhere. After reviewing the record, the circuit court determined that the California action involved the same parties as the West Virginia action (including ABDC, St. Paul, and ACE American), and involved the same policy language contained in the sixteen insurance policies at issue in West Virginia. The circuit court found:

> Whatever differences exist between this action and St. Paul's California Coverage Action, at a minimum, St. Paul is asking the California court to issue declarations governing the parties already before this Court, interpreting the exact same insurance policy language already before this Court, regarding the same type of cases already before this Court, and regarding the same cases on which this Court permitted the Insurer Defendants to take discovery, raising the identical coverage issues already pending before this Court, including coverage issues on which this Court has already issued rulings.

Additionally, the circuit court examined St. Paul's "carve-out" footnote stating that the prescription opioid lawsuits before the circuit court were "not intended to be the subject of" the California action. The circuit court said it was "unpersuaded that this carve-out creates a meaningful distinction between these disputes[] or would meaningfully protect the jurisdiction of [the circuit court] and the orderly resolution of this dispute." The circuit court then concluded by ruling that "[a]ll parties are hereby enjoined from instituting or prosecuting any collateral litigation or other proceeding against one another relating to insurance coverage for the prescription opioid lawsuits against . . . ABDC, or any other affiliated entity."

8

Defendant St. Paul now appeals the circuit court's January 7, 2021, injunction order. Defendant Ace American subsequently filed a motion to intervene and join St. Paul in appealing the circuit court's order, a motion this Court granted.

## II. Standard of Review

A circuit court entering an injunction is guided by the following discretionary standard:

> The granting or refusal of an injunction . . . calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ.

Syl. pt. 4, *State v. Baker*, 112 W. Va. 263, 164 S.E. 154 (1932). Hence, we apply the following deferential standards to our review of an order granting injunctive relief:

> In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of . . . [an] injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the . . . injunction and the ultimate disposition under an abuse of discretion standard, we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law de novo.

Syl. pt. 1, *State By & Through McGraw v. Imperial Mktg.*, 196 W. Va. 346, 472 S.E.2d 792 (1996) (citations omitted).

With these guidelines in mind, we examine the circuit court's order.

9

## III. Discussion

St. Paul and Ace American contend that the circuit court erred in issuing an anti-suit injunction precluding the prosecution of the California action. They assert that the West Virginia and California actions are not "parallel proceedings" because there is no overlap between the claims at issue in the West Virginia action and the claims in the California action. Hence, St. Paul and Ace American contend that ABDC has failed to show any irreparable harm, sufficient to support an injunction, from the California action.

To fully assess the parties' positions, we begin by considering the power of a circuit court to issue an anti-suit injunction. "An anti-suit injunction is a legal order barring litigants from instituting or prosecuting the same or a similar action in another state." John Ray Phillips, III, *A Proposed Solution to the Puzzle of Anti-suit Injunctions*, 69 U. Chi. L. Rev. 2007, 2009 (2002). "Typically, a court may issue an injunction to enjoin only those acts occurring within that court's territorial jurisdiction." *Kessel v. Leavitt*, 204 W. Va. 95, 150, 511 S.E.2d 720, 775 (1998). However, a well-recognized exception exists that permits circuit courts to enjoin acts outside of their territorial jurisdiction. West Virginia Code § 53-5-4 (1923) provides:

> Every judge of a circuit court shall have general jurisdiction in awarding injunctions, whether the judgment or proceeding enjoined be in or out of his circuit, or the party against whose proceeding the injunction be asked reside in or out of the same.

10

West Virginia Code § 53-5-4 enables a circuit court to enjoin the parties to an action from pursuing substantially similar litigation in another court that threatens the circuit court's ability to resolve the action. Stated simply, there is no question that West Virginia courts are empowered to issue injunctions to prevent parties from going forward with parallel or duplicative litigation in a sister state. In the context of anti-suit injunctions, the terms "parallel," "duplicative," or "substantially similar" litigation involve a three-part test "that assesses (1) the similarity of the parties; (2) the similarity of the issues; and (3) the capacity of one action to dispose of the action to be enjoined." *Maslowski v. Prospect Funding Partners LLC*, 890 N.W.2d 756, 767 (Minn. Ct. App. 2017).

We discussed the long-standing equitable power to issue anti-suit injunctions in *State v. Fredlock*, 52 W. Va. 232, 43 S.E. 153 (1903), finding that when a circuit court asserts jurisdiction over a cause of action, the court's jurisdiction embraces "every question arising which could be determined" in the case and "could not be trenched upon by any other tribunal." *State v. Fredlock*, 52 W. Va. at 240, 43 S.E. 153, 156 (1903) (quoting *French v. Hay*, 89 U.S. 250, 253 (1874)). We therefore held, in Syllabus Point 1 of *Fredlock*, that

> [w]hen the jurisdiction of a court is asserted over a cause of action, it embraces everything in the case and every question arising which can be determined in it; and, until thus exhausted, or in some way relinquished, the jurisdiction is exclusive and cannot be encroached upon by any other tribunal.

52 W. Va. at 232, 43 S.E. at 153.

11

When, however, the parties before the circuit court initiate parallel litigation in another court, or otherwise ask another court to act in a manner that invades or encroaches upon the circuit court's ability to resolve a pending cause of action or controversy, this Court determined that a circuit court is authorized by West Virginia Code § 53-5-4 and by principles of equity to enter an injunction designed to "uphold, maintain and protect a jurisdiction which attaches upon grounds wholly independent of the injunction." *Id.* at 239, 43 S.E. at 156. In other words, a circuit court may enjoin a party from pursuing a parallel case in the courts of another state.[7] This Court concluded, in Syllabus Point 2 of *Fredlock*, that

> [a] court having jurisdiction *in personam*, may require the defendant to do, or refrain from doing, beyond its territorial jurisdiction, anything which it has power to require him to do or omit within the limits of its territory.

52 W. Va. at 233, 43 S.E. at 153. Stated differently, "a court has a duty, as well as power, to protect its jurisdiction over a controversy in order to decree complete and final justice

---

[7] As for a party's attempt to pursue substantially similar litigation in another West Virginia circuit court, Rule 42(b) of the West Virginia Rules of Civil Procedure provide circuit courts with the appropriate remedy:

> When two or more actions arising out of the same transaction or occurrence are pending before different courts or before a court and a magistrate, the court in which the first such action was commenced shall order all the actions transferred to it or any other court in which any such action is pending. The court to which the actions are transferred may order a joint hearing or trial of any or all of the matters in issue in any of the actions; it may order all the actions consolidated; and it may make such other orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

12

between the parties and may issue an injunction for that purpose[.]" *James v. Grand Trunk W. R. Co.*, 152 N.E.2d 858, 865 (Ill. 1958).

> The injunction is directed, not to the court, but to the litigant parties, and in no manner denies the jurisdiction of the legal tribunal. It merely seeks to control the person to whom it is addressed, and to prevent him from using the process of courts of law where it would be against conscience to allow him to proceed. It is granted on the ground that an unfair use is being made of the legal forum, which, from circumstances of which equity alone can take cognizance, should be restrained, lest an injury be committed, wholly remediless at law.

To be clear, an anti-suit injunction applies only to the parties before the circuit court, not to the other court or other judge presiding over the parallel case.

52 W. Va. at 247-48, 43 S.E. at 159 (cleaned up). *See also*, W. Va. R. Civ. Pro. Rule 65(d) ("Every order granting an injunction . . . is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise."); Kurtis A. Kemper, *Propriety Under Circumstances of State Court Injunction Against Nonmatrimonial Action in Court of Sister State*, 20 A.L.R.6th 211 (2006) ("It is clearly within the equitable powers of a state court to restrain a person over whom it has jurisdiction from instituting or proceeding with an action in a sister state's court. The exercise of such power does not direct or control a sister state's court but operates in personam upon a party over whom the court has jurisdiction."). Circuit courts have the power to enjoin parties from pursuing parallel litigation "in sister state courts

13

under the common law doctrine of comity; and . . . in foreign countries." James P. George, *Parallel Litigation*, 51 Baylor L. Rev. 769, 781 (1999).

When entering an injunction precluding parties from pursing parallel litigation in a sister state, circuit courts are guided by two concepts: comity and equity.

Comity compels a court to act cautiously and with restraint. Stated broadly, when considering whether to issue an anti-suit injunction, "[t]he principle of comity requires that courts exercise the power to enjoin foreign suits sparingly and only in very special circumstances where a clear equity is presented requiring the interposition of the court to prevent manifest wrong and an irreparable miscarriage of justice." 42 Am. Jur. 2d Injunctions § 186 (2021). Comity is a flexible, court-created doctrine of deference by one court toward another designed to promote "legal harmony and uniformity among the co-equal states." *Pasquale v. Ohio Power Co.*, 187 W. Va. 292, 300, 418 S.E.2d 738, 746 (1992). As one court noted

> comity is not a constitutional requirement to give full faith and credit to the law of a sister state, but it is a rule of convenience and courtesy. The doctrine of judicial comity represents a willingness to grant a privilege, not as a matter of right, but out of deference and good will.

*Cloverleaf Enterprises, Inc. v. Centaur Rosecroft, LLC*, 815 N.E.2d 513, 519 (Ind. Ct. App. 2004) (citations omitted). *See also Hawsey v. Louisiana Dep't of Soc. Servs.*, 934 S.W.2d 723, 726 (Tex. App. 1996) ("Comity is a principle under which the courts of one state give effect to the laws of another state . . . not as a rule of law, but rather out of deference or respect."). Courts apply principles of comity "to foster cooperation, promote harmony,

and build goodwill." *Trillium USA, Inc. v. Bd. of Cty. Comm'rs of Broward Cty., Fla.*, 37 P.3d 1093, 1098 (Utah 2001). "Courts sometimes use the term 'comity' as a shorthand term to explain why a forum court is deferring to the law or rulings of another jurisdiction." *Russell v. Bush & Burchett, Inc.*, 210 W. Va. 699, 703 n.4, 559 S.E.2d 36, 40 n.4 (2001).[8]

In addition to comity, circuit courts weighing whether to issue an anti-suit injunction are guided by fundamental principles of equity. Our review of the law reveals that state courts have granted anti-suit injunctions after identifying equitable concerns

---

[8] One treatise suggests that considerations of comity might impel a circuit court, through the parties, to encourage

> the sister state's court to address concerns such as the duplication of parties and issues, the expense and effort of simultaneous litigation in two courts, and the potential for inconsistent judgments by means of a motion to stay or dismiss the proceedings based on forum non conveniens considerations or other grounds.

Kurtis A. Kemper, *Propriety Under Circumstances of State Court Injunction Against Nonmatrimonial Action in Court of Sister State*, 20 A.L.R.6th 211, § 2 (2006). However, another commentator noted

> Traditionally, interstate recognition of antisuit injunctions is said to be a matter of "comity," defined as "the nonmandatory acceptance by one jurisdiction of the law of another." In practice, comity has never been a weighty, let alone dispositive, consideration for courts. As Justice Story wrote, it as an "imperfect obligation, like that of beneficence, humanity, and charity." Not surprisingly, then, when considering whether to recognize antisuit injunctions, courts pay homage to comity but seldom invoke it as the sole ground for their decision.

Phillips, *A Proposed Solution to the Puzzle of Antisuit Injunctions*, 69 U. Chi. L. Rev. at 2015-16 (footnotes omitted).

about interference with the court's jurisdiction,[9] duplicative suits,[10] and vexatious litigation.[11] Additionally, state courts have issued anti-suit injunctions when a foreign-state lawsuit would circumvent the enforcement of the state's public policy.[12] The Texas Supreme Court has distilled the cases into the following guide:

---

[9] *See, e.g., Staton v. Russell*, 565 S.E.2d 103, 109 (N.C. App., 2002) (permitting anti-suit injunction because "appellants' continued prosecution of the Florida action threatened our trial court's jurisdiction over issues that affect the rights of parties not represented in the Florida action."); *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 449–50 (Minn. Ct. App. 2001) ("When a party acts 'in a calculated and systematic manner . . . to deprive the [Minnesota] court of its jurisdiction,' issuing an injunction to stop the action in another jurisdiction is appropriate.")

[10] *See, e.g., Forum Ins. Co. v. Bristol-Myers Squibb Co.*, 929 S.W.2d 114, 120 (Tex. App. 1996) ("'[C]lear equity' favors all parties seeking a completion and finality to their dispute in a single proceeding without the vexation of potentially multiplicitous or harassing litigation."); *Glitsch, Inc. v. Harbert Const. Co., a Div. of Harbert Int'l*, 628 So. 2d 401, 403 (Ala. 1993) (upholding anti-suit injunction by Alabama trial court precluding prosecution of parallel action in Texas, because "the actions are substantially the same and because of the hardship to the parties to litigate in two forums, with the possibility of inconsistent results[.]"); *Cajun Electric Power Coop., Inc. v. Triton Coal Co.*, 590 So.2d 813, 816-18 (La. App. 1991) (an anti-suit injunction should issue where "[t]he two suits are clearly duplicative, and permitting both suits to continue only thwarts the legitimate effort to avoid a multiplicity of lawsuits for the benefit of both the litigants and the courts.").

[11] *See, e.g., Am. Int'l Specialty Lines Ins. Co. v. Triton Energy Ltd.*, 52 S.W.3d 337, 342 (Tex. App. 2001) (Texas trial court granted anti-suit injunction, finding insurer's later-filed suit in California was "vexatious and harassing," because rather than "submitting to the jurisdiction of the Texas court and abiding by its decision . . . [the insurer] filed suit in California and proceeded to race to judgment there."); *Wallace Butts Ins. Agency, Inc. v. Runge*, 314 S.E.2d 293, 297 (N.C. App. 1984) (trial judge correctly entered restraining order so that defendant would not be "forced to defend two lawsuits in separate states involving the same subject matter resulting in vexation, harassment, annoyance and great expense.").

[12] *See, e.g., Maslowski v. Prospect Funding Partners LLC*, 890 N.W.2d 756, 769 (Minn. Ct. App. 2017) ("[E]quity supports an anti-suit injunction when a party

Continued . . .

16

An anti-suit injunction is appropriate in four instances: 1) to address a threat to the court's jurisdiction; 2) to prevent the evasion of important public policy; 3) to prevent a multiplicity of suits; or 4) to protect a party from vexatious or harassing litigation.

*Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 651 (Tex. 1996). Similarly, the *Restatement (Fourth) of Foreign Relations Law* proffers an equitable guide for anti-suit injunctions to preclude parallel litigation in other countries, and says:

A court in the United States may enjoin persons subject to its jurisdiction from pursuing parallel foreign proceedings. An antisuit injunction is an exceptional remedy and is appropriate only if the foreign proceeding threatens the court's jurisdiction, frustrates an important public policy of the forum, is vexatious or inequitable, or would result in delay, inconvenience, expense, inconsistency, or a race to judgment.

*Restatement (Fourth) of Foreign Relations Law* § 425 (2018).

After consideration of these authorities, we hold that an anti-suit injunction is an order barring parties to an action in this state from instituting or prosecuting substantially similar litigation in another state. Whether the foreign state action is substantially similar involves assessing (1) the similarity of the parties; (2) the similarity of the issues; and (3) the capacity of the action in this state to dispose of the foreign state action.

---

attempts to evade the effects of Minnesota law[.]"); *AutoNation, Inc. v. Hatfield*, 186 S.W.3d 576, 581 (Tex. App. 2005) (anti-suit injunction was proper because litigation in foreign state would "likely apply a legal standard contrary to the public policy of this state" and "Texas public policy may be thwarted[.]").

We further hold that the principle of comity requires that a circuit court enter an anti-suit injunction cautiously and with restraint. An anti-suit injunction is an exceptional remedy but is appropriate when equity compels the circuit court: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of an important public policy; (3) to prevent a multiplicity of suits that result in delay, inconvenience, expense, inconsistency, or will be a "race to judgment"; or (4) to protect a party from vexatious, inequitable or harassing litigation.

With these standards in mind, we now examine the circuit court's order. St. Paul offers an interpretation of the record which posits that the circuit court erred because no "parallel proceedings" have been filed in California. The common refrain of St. Paul's brief is a contention that the West Virginia lawsuit "concerns only 50 specific lawsuits that were filed in West Virginia and one St. Paul insurance policy" issued in 2006 to ABDC's parent company, AmerisourceBergen Corporation. St. Paul also says that

> the California Action concerns questions regarding insurance coverage for more than 3,500 underlying opioid-related lawsuits filed against [ABDC and its affiliates] in California and elsewhere---*expressly excluding the 50 underlying suits at issue in this case*---under a multitude of policies dating from the mid-1990s that were issued by the 75 insurance companies that are named parties in the California Action.

Using its own construal of the facts, St. Paul insists that "there is no overlap between the underlying claims at issue in the California Action and this case," and, thus, the circuit court erred in finding any prejudice or harm to ABDC by the California coverage action. Moreover, St. Paul claims that the circuit court "interfere[d] with and assert[ed] control

18

over litigation in a court in another state more than 2,000 miles away," and that the court's order "reflects a stunning disregard for fundamental principles of comity and sovereignty between the courts of different states."

We have reviewed the record and the circuit court's order, and we reject the interpretation of the facts asserted by St. Paul. The record reflects a substantially different factual picture than that painted by St. Paul in its brief. It is true that ABDC's complaint and amended complaint initially identified fifty specific opioid-related lawsuits in West Virginia. Nevertheless, ABDC also said in its 2017 amended complaint that "[a]dditional counties, towns, and cities in West Virginia have publicly announced that they intend to file prescription opioid lawsuits" and that ABDC "reserve[d] the right to include additional lawsuits in this civil action." The record shows that, in the three-and-a-half year course of discovery, ABDC informed St. Paul of 165 specific opioid-related lawsuits in West Virginia for which ABDC sought defense or indemnity costs from St. Paul.

Moreover, we find no error in the circuit court's conclusion that St. Paul instituted competing, parallel litigation in California. First, both the West Virginia action and the California action involve, not merely similar parties, but identical parties. Every single one of the plaintiffs and defendants in the West Virginia action are parties in the California action.[13] That St. Paul chose to include dozens of additional parties in the

_____

[13] ABDC and its subsidiary, Bellco Drug Corporation, are the plaintiffs in the West Virginia action; the California action was filed against ABDC, Bellco Drug Corporation, and other corporate affiliates of ABDC. St. Paul is one of five defendants in

Continued . . .

19

California action does not negate the circuit court's finding that all of the parties in the West Virginia action are parties to the California action. Second, the competing cases involve similar issues: the West Virginia case seeks to interpret sixteen specific insurance policies in effect between 2006 and 2013; the California case seeks to interpret those same policies, as well as seemingly every other insurance policy issued to ABDC and its affiliates between 1995 and 2018. Third, the circuit court could fairly conclude that the resolution of the West Virginia action would dispose of a portion of the California action, certainly as to the interpretation of the sixteen insurance policies identified in the West Virginia complaint, and possibly as to other policies at issue in California that contain language comparable to that in dispute in West Virginia. Hence, we find no error in the circuit court's conclusion that St. Paul initiated substantially similar litigation in California which overlapped and competed with the issues pending in West Virginia.

The next question we must address is whether, in light of principles of comity and equity, the circuit court abused its discretion in entering the injunction. As a general matter, the circuit court found that it was uniquely situated because it was the first court in the nation to oversee a prescription opioid lawsuit brought by a government entity (the Attorney General in 2012) against a pharmaceutical distributor, and it was one of the first

_____

the West Virginia action and is the lead plaintiff in the California action. The other four defendants in the West Virginia action (Ace American Insurance Company; Ace Property and Casualty Insurance Company; American Guarantee & Liability Insurance Company; and Endurance American Insurance Company) are named defendants in the California action.

to bring such a case to a final resolution. Because of the extent of the opioid epidemic in West Virginia, the courts of this state have a compelling interest in determining whether the policies at issue in ABDC's West Virginia suit provide coverage for the underlying claims brought by West Virginia entities, without competing rulings from a foreign court.

The circuit court found its ability to successfully resolve the West Virginia suit was threatened by St. Paul's California action. The circuit court had expended substantial resources overseeing litigation for three-and-a-half years and gained a unique understanding of the parties and issues. Additionally, at the request of the parties early in the case, the circuit court had entered a "stay order" focusing discovery and litigation on insurance coverage for the Attorney General's now-completed 2012 lawsuit, and otherwise staying the examination of coverage for all other West Virginia cases. In part, the stay order was the result of St. Paul telling the circuit court that the underlying allegations against ABDC in the Attorney General's lawsuit were materially identical in all other suits, in West Virginia and nationwide. St. Paul's California action violated the terms and spirit of the circuit court's stay order and was effectively a means of litigating the coverage questions stayed by the circuit court.

The circuit court also determined that St. Paul's California action created a multiplicity of suits that would, by design, complicate the West Virginia coverage issues and would inevitably result in unnecessary and improper delays. The circuit court noted that St. Paul filed the California action three-and-a-half years after the West Virginia action was filed, "without making any effort to join in [the West Virginia] action any of the parties

21

or insurance policies it now claims are essential to the resolution of this dispute."[14] Additionally, St. Paul filed suit in California "despite the fact that none of the eighty-three parties . . . are headquartered in California and only one of the eighty-three parties is incorporated in California ([and] that party has its principal place of business in Texas)." The circuit court fairly concluded that St. Paul's parallel suit in California was filed for improper purposes, namely forum shopping and the disruption of the orderly resolution of the West Virginia suit.

On this record, we find no error by the circuit court in its decision to enter an anti-suit injunction. The circuit court's order demonstrates the existence of exceptional circumstances, and the court did not abuse its discretion in finding equity compelled an order. Like the circuit court, we too are unpersuaded by St. Paul's "carve-out" footnote in its California complaint claiming some portion of the West Virginia action "is not intended to be" the subject of the California action. The broad language of the California complaint clearly subsumes and seeks rulings on the exact issues that are to be decided (or have already been decided) in West Virginia. Hence, an injunction was needed to prevent a threat to the court's jurisdiction and ability to resolve the West Virginia coverage suit, and to prevent a multiplicity of suits filed with the intent of causing delay, expense and inconsistent judgments.

---

[14] We note that, in three-and-a-half years of litigation, ABDC also did not seek to expand the scope of its West Virginia action and join any of the parties or insurance policies exclusively at issue in the California action.

That said, having reviewed the terms of the circuit court's order, we do find an abuse of discretion in its breadth and focus. Ace American's argument to this Court notes that the circuit court's order only enjoined ABDC and the five insurers who were parties to the West Virginia action from further litigation; it did nothing to enjoin the dozens of other parties to the California action who issued countless other policies to ABDC and its affiliates. Ace American points out that many of the California-only parties have proceeded to file cross-claims, counter-claims, and discovery requests in response to St. Paul's complaint, but the circuit court's order precludes ABDC and the five insurers who are parties to the West Virginia action from effectively responding.[15]

As we noted earlier, the anti-suit injunction order enjoins *all parties* to the West Virginia action from instituting or prosecuting *any* legal proceeding concerning ABDC's insurance coverage.[16] Our concern is that ABDC's West Virginia complaint is limited in scope and seeks a declaratory judgment concerning only sixteen insurance policies issued by five insurance companies. As ABDC's complaint is cast, it asks the circuit court for a judgment regarding whether those sixteen policies provide coverage for

---

[15] Ace American contends that the circuit court's injunction violated the bedrock principle that "equity never does a useless thing." *Kennewig Co. v. Moore*, 49 W. Va. 323, 325, 38 S.E. 558, 558 (1901). We do not think the circuit court's error was "useless," as Ace American claims; rather, as we discuss in the text, we find the order's conclusion was, seemingly, overbroad.

[16] As a reminder, the circuit court's order provides: "All parties are hereby enjoined from instituting or prosecuting any collateral litigation or other proceeding against one another relating to coverage for the prescription opioid lawsuits against . . . ABDC, or any other affiliated entity."

23

the growing number of West Virginia-based opioid lawsuits. The circuit court was within its rights to protect its jurisdiction to resolve the dispute as presented by ABDC.

However, as it is written, the circuit court's order impairs the parties' ability to litigate, against each other or with third parties, over policies separate from the sixteen policies identified by ABDC. Stated simply, the order is unclear as to why the circuit court precluded the litigation of *any* issues between the parties, if those issues were unrelated to the interpretation of the sixteen insurance policies at issue in the West Virginia action. Moreover, by preventing any litigation activity between the parties, the circuit court's order effectively precluded the parties from pursuing some agreed-upon resolution of the California action, or a resolution from the California court such as a stay or a dismissal.

We understand that the circuit court's judgment interpreting the policies at issue will become precedent for future cases in sister states, but we do not yet see that as a compelling reason to prevent the parties from litigating comparable questions of coverage for opioid lawsuits, regarding different policies, in other forums. As it is written, the circuit court's order does not make clear why questions pertaining to policies other than the sixteen policies identified by ABDC cannot be the subject of litigation in our sister states. Principles of comity require a court to act with restraint and to respect the idea that the courts of our sister states will likewise act with fairness and restraint. In this instance, despite the circuit court's conclusion that St. Paul had questionable motives in filing its California action, we find that the circuit court's order should have clearly and finely

24

tailored a connection between the relief sought in ABDC's West Virginia action and the prohibition of the parties' actions in California.

Accordingly, we find the circuit court's order to be overbroad and, as currently drafted, to constitute an abuse of the court's discretion. The order must therefore be reversed, and the case remanded for reconsideration.

## IV. Conclusion

Upon our review of the law and the record, we find the circuit court clearly had the authority to enter an anti-suit injunction. Hence, we affirm the circuit court's decision to enter an injunction. However, an anti-suit injunction is an exceptional remedy and must be narrowly tailored to address the equitable circumstances presented. As the circuit court's order is drafted, we find it to be overbroad and, therefore, an abuse of discretion. Thus, we must therefore reverse the circuit court's January 7, 2021, order, and remand the case for clarification of the order or such other proceedings as are necessary.

Affirmed, in part, reversed, in part, and remanded.